# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

### Case No.:  _____

GOVERNMENT EMPLOYEES INSURANCE CO.,
GEICO INDEMNITY CO., GEICO GENERAL
INSURANCE COMPANY and GEICO CASUALTY
CO.,

       Plaintiffs,

vs.

TODD MCCLERREN, D.C., ATM HEALTHCARE,
INC. d/b/a INJURY CARE CENTERS,

      Defendants.

_____/

**Jury Trial Demanded**

## COMPLAINT AND DEMAND FOR A JURY TRIAL

Plaintiffs, Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs"), sue the Defendants and allege as follows:

1.    This action seeks to recover more than $7,900,000.00 that the Defendants wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent no-fault ("no-fault", "personal injury protection", or "PIP") insurance charges through Defendant ATM Healthcare, Inc. d/b/a Injury Care Centers ("ATM Healthcare") relating to medically unnecessary, illusory, unlawful, and otherwise non-reimbursable health care services, including initial examinations, follow-up examinations, chiropractic services, physical therapy services, pain

management injections, and "extracorporeal shockwave therapy" ("ESWT") (collectively, the "Fraudulent Services"), that purportedly were provided to Florida automobile accident victims ("Insureds") who were eligible for coverage under GEICO no-fault insurance policies.

2.    In addition, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $75,000.00 in pending, fraudulent and unlawful PIP claims that the Defendants have submitted or caused to be submitted through ATM Healthcare, because:

(i)    the Defendants operated in pervasive violation of: (a) the licensing and operating requirements set forth in the Florida Health Care Clinic Act, Fla. Stat. § 400.990 et seq. (the "Clinic Act"); (b) Fla. Stat. § 817.234(7) (the "False and Fraudulent Insurance Claims statute"); and (c) the Physical Therapy Practice Act, Fla. Stat. § 486.011-486.172 ("the Physical Therapy Act") thereby rendering them ineligible to collect PIP insurance benefits in the first instance, and rendering their PIP insurance charges noncompensable and unenforceable;

(ii)    the Fraudulent Services were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to it;

(iii)    in many cases, the Fraudulent Services never were legitimately provided in the first instance;

(iv)    the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to fraudulently and unlawfully inflate the charges submitted to GEICO; and

(v)    in many cases, ATM Healthcare unlawfully billed GEICO for "physical therapy" services performed by a massage therapist or another unlicensed individual.

2

3.      The Defendants fall into the following categories:

(i)     ATM Healthcare is a Florida corporation that falsely purported to be exempt from the Clinic Act's clinic licensing and operating requirements, operated in pervasive violation of the Clinic Act, the False and Fraudulent Insurance Claims statute, and the Physical Therapy Act, and was used by the Defendants as a vehicle to submit fraudulent and unlawful PIP billing to GEICO and other insurers.

(ii)    Defendant Todd McClerren, D.C. ("McClerren") is licensed as a chiropractor in Florida. McClerren owned and controlled ATM Healthcare, used ATM Healthcare as a vehicle to submit fraudulent billing for the Fraudulent Services to GEICO and other insurers, and purported to perform many of the Fraudulent Services on behalf of ATM Healthcare.

4.      As set forth below, Defendants at all relevant times have known that:

(i)     The Defendants operated in pervasive violation of: (a) the licensing and operating requirements set forth in the Clinic Act; (b) the False and Fraudulent Insurance Claims statute; and (c) the Physical Therapy Act, thereby rendering them ineligible to collect PIP insurance benefits in the first instance, and rendering their PIP insurance charges noncompensable and unenforceable;

(ii)    the Fraudulent Services were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iii)   in many cases, the Fraudulent Services never were provided in the first instance;

(iv)    the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to fraudulently and unlawfully inflate the charges submitted to GEICO; and

(v)     in many cases, ATM Healthcare unlawfully billed GEICO for "physical therapy" services performed by a massage therapist or another unlicensed individual.

5.      As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that were billed through ATM Healthcare to GEICO.

6.      The chart annexed hereto as Exhibit "1" sets forth a representative sample of the fraudulent claims that have been identified to date that Defendants have submitted, or caused to be submitted, through ATM Healthcare to GEICO via the mail.

7.      The Defendants' fraudulent scheme began no later than 2017 and has continued uninterrupted since that time. As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $7,900,000.00.

## THE PARTIES

### I.      Plaintiffs

8.      Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. (collectively, "GEICO") are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in Florida.

### II.     Defendants

9.      Defendant McClerren resides in and is a citizen of Florida. McClerren was licensed to practice chiropractic in Florida on August 10, 1993. McClerren owned and controlled ATM Healthcare, purported to perform or provide Fraudulent Services

on behalf of ATM Healthcare, and caused the billing for the Fraudulent Services to be submitted by mail through ATM Healthcare to GEICO and other insurers.

10.    McClerren has a history of professional discipline by the Florida Board of Chiropractic Medicine and Department of Health.

11.    First, in 2009, McClerren was fined and ordered to complete continuing education courses after he pleaded no contest to a charge of resisting arrest, and failed to report his plea to the Board of Chiropractic Medicine as required by the pertinent chiropractic licensing regulations.

12.    Then, in separate disciplinary proceedings in 2010, McClerren was fined again, and again ordered to complete continuing remedial education classes, after the Department of Health charged him with engaging in an unlawful patient brokering and kickback scheme with various health care providers, whereby McClerren would refer patients to the other health care providers in exchange for the bulk of the insurance money received on the resulting insurance claims.

13.    Upon information and belief, McClerren's history of professional discipline – which can be located by prospective employers, referral sources, and patients through a simple internet search – has made it practically impossible for him to obtain legitimate employment as a chiropractor, and contributed to his decision and motive to participate in the fraudulent scheme described herein.

14.    Defendant ATM Healthcare is a Florida corporation with its principal place of business in Jacksonville, Florida. ATM Healthcare was incorporated on or about May 16, 2016, had McClerren as its president and owner, and was used as a

vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

### III.   The ATM Chiropractors, Physicians, and Nurses

15.     Although not presently named as Defendants in this action, Adam Francis, D.C. ("Francis"), Amanda Steelman, D.C. ("Steelman"), Austin Mead, D.C. ("Mead"), Bret Toftness, D.C. ("Toftness"), Donald Lowery, D.C. ("Lowery"), Kelsey Clevenger, D.C. ("Clevenger"), Lewalie Henley, D.C. ("Henley"), Loren Thorton, D.C. ("Thorton"), Michael Hempfield, D.C. ("Hempfield"), Nicholas Herrild, D.C. ("Herrild"), Randy John, D.C. ("John"), Richard Bloom, Sr., D.C. ("Bloom"), Rolando Emmanuel Perez Mendez, D.C. ("Mendez"), and Vanessa Wilczak, D.C. ("Wilczak") (collectively the "ATM Chiropractors") are relevant to understanding the claims and allegations in this Complaint. The ATM Chiropractors are all chiropractors licensed to practice chiropractic in Florida, and purported to perform many of the Fraudulent Services on behalf of ATM Healthcare.

16.     Elizabeth Chandler, M.D. ("Chandler"), Jeffrey Oppenheimer, M.D. ("Oppenheimer"), Mark Timken, M.D. ("Timken"), Michael Warhurst, D.O. ("Warhurst"), and Suyin Lee, D.O. ("Lee") (collectively the "ATM Physicians") also are relevant to understanding the claims and allegations in this Complaint. The ATM Physicians are physicians licensed to practice medicine in Florida, were employed by or associated with ATM Healthcare, and purported to perform many of the Fraudulent Services on behalf of ATM Healthcare.

17.     Furthermore, Richard Malcolm, APRN ("Malcolm") and Darien Rhoades, APRN ("Rhoades") (collectively the "ATM Nurses") are relevant to understanding the claims and allegations in this Complaint. The ATM Nurses are registered nurses and nurse practitioners licensed to practice in Florida, were employed by or associated with ATM Healthcare, and purported to perform many of the Fraudulent Services on behalf of ATM Healthcare.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interest and costs, exceeds the jurisdictional threshold of $75,000.00, and is between citizens of different states.

19.     This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. § 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act).

20.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

21.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Middle District of Florida is the District where one or more of Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS

### I.    An Overview of the Pertinent Law Governing No-Fault Insurance Reimbursement

**A.    The Florida No-Fault Law**

22.    Florida has a comprehensive statutory system designed to ensure that motor vehicle accident victims are compensated for their injuries.  The statutory system is embodied within the Florida Motor Vehicle No-Fault Law (the "No-Fault Law", Fla. Stat. §§ 627.730-627.7405), which requires automobile insurers to provide Personal Injury Protection benefits ("PIP Benefits") to Insureds.

23.    Under the No-Fault Law, an Insured can assign his or her right to PIP Benefits to health care services providers in exchange for those services. See Fla. Stat. § 627.736. Pursuant to a duly executed, valid assignment, a health care services provider may submit bills directly to an insurance company in order to receive payment for medically necessary services, using the required claim forms, including the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form"). See id.

**B.    No-Fault Reimbursement and Compliance with Florida Law Governing Health Care Practice**

24.    In order for a health care service to be eligible for PIP reimbursement, it must be "lawfully" provided. See Fla. Stat. § 627.736.

25.    Pursuant to the No-Fault Law, "lawful" or "lawfully" means "in substantial compliance with all relevant applicable criminal, civil, and administrative

requirements of state and federal law related to the provision of medical services or treatment." See Fla. Stat. § 627.732.

26.     Thus, health care services providers may not recover PIP Benefits for health care services that were not provided in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of Florida and federal law related to the provision of the underlying services or treatment – including, among other things, the Clinic Act, the Physical Therapy Act, and the False and Fraudulent Insurance Claims statute.

27.     By extension, insurers such as GEICO are not required to make any payments of PIP Benefits for health care services that were not provided in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of Florida and federal law related to the provision of the underlying services or treatment.

**C.     No-Fault Reimbursement and the False and Fraudulent Insurance Claims Statute**

28.     Under the False and Fraudulent Insurance Claims statute, it is unlawful for a health care provider to engage in the general business practice of waiving, or failing to make a good-faith effort to collect, co-payments or deductibles from PIP patients. See Fla. Stat. § 817.234(7).

29.     Failure to make a good-faith effort to collect co-payments or deductibles renders the charges submitted by a health care provider unlawful and noncompensable.

**D.    No-Fault Reimbursement and the Clinic Act**

30.    Subject to certain limited exceptions, a license issued by the Florida Agency for Health Care Administration is required in order to operate a "clinic", or health care practice, in Florida. See Fla. Stat. § 400.991(1)(a). In this context, the Clinic Act defines "clinic" to mean "an entity where health care services are provided to individuals and which tenders charges for reimbursement for such services, including a mobile clinic and a portable equipment provider." See Fla. Stat. § 400.9905.

31.    However, the Clinic Act provides an exemption from the clinic licensing requirements for:

> A sole proprietorship, group practice, partnership, or corporation that provides health care services by licensed health care practitioners . . . that is wholly owned by one or more licensed health care practitioners, or the licensed health care practitioners set forth in this paragraph and the spouse, parent, child, or sibling of a licensed health care practitioner if one of the owners who is a licensed health care practitioner is supervising the business activities and is legally responsible for the entity's compliance with all federal and state laws. However, a health care practitioner may not supervise services beyond the scope of the practitioner's license … .

Fla. Stat. § 400.9905(4)(g)(emphasis added).

32.    Therefore, in order to qualify for this "wholly owned" exemption to the Clinic Act's licensing requirements, the licensed health care practitioner who "wholly owns" the practice has a continuing obligation to supervise the business activities of the clinic and remain legally responsible for the clinic's compliance with all federal and state laws, and the practice cannot provide health care services that are beyond the scope of the practitioner-owner's license.

33.   A clinic that does not qualify for the wholly owned exemption, and does not otherwise have a license, operates unlawfully under Florida law.

34.   Unless they are operating pursuant to an exemption from the clinic licensing requirements, clinics operating in Florida not only must obtain a clinic license, but also must "appoint a medical director or clinic director who shall agree in writing to accept legal responsibility for [certain enumerated] activities on behalf of the clinic." See Fla. Stat. § 400.9935(1).

35.   Among other things, a clinic medical director must be a licensed physician, and must "[c]onduct systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful. Upon discovery of an unlawful charge, the medical director or clinic director shall take immediate corrective action." See Fla. Stat. § 400.9935(1).

36.   In addition, a clinic medical director must "[e]nsure that all practitioners providing health care services or supplies to patients maintain a current active and unencumbered Florida license", and "[e]nsure that all health care practitioners at the clinic have active appropriate certification or licensure for the level of care being provided." See Fla. Stat. § 400.9935(1).

37.   Pursuant to the Clinic Act, "[a] charge or reimbursement claim made by or on behalf of a clinic that is required to be licensed under this part but that is not so licensed, or that is otherwise operating in violation of this part, regardless of whether a service is rendered or whether the charge or reimbursement claim is paid, is an unlawful charge and is noncompensable and unenforceable. A person who knowingly

makes or causes to be made an unlawful charge commits theft within the meaning of, and punishable as provided in, [Fla. Stat. §] 812.014." See Fla. Stat. § 400.9935(3).

38.     Thus, pursuant to both the No-Fault Law and the Clinic Act, clinics that operate in violation of the Clinic Act's licensing, medical director, or other operating requirements are not entitled to collect PIP Benefits, whether or not the underlying health care services were medically necessary or actually provided.

39.     By extension, insurers such as GEICO are not required to make any payments of PIP Benefits to clinics that operate in violation of the Clinic Act's licensing, medical director, or other operating requirements, whether or not the underlying health care services were medically necessary or actually provided.

### E.     No-Fault Reimbursement, Massage Therapy, Massage Therapists, and Physical Therapy

40.     Prior to January 1, 2013, the No-Fault Law permitted health care services providers, including clinics licensed under the Clinic Act, to collect PIP Benefits for massage therapy and other services performed by massage therapists, so long as – among other things – the services were "provided, supervised, ordered, or prescribed" by a licensed physician, chiropractor, or dentist, or was provided in a properly licensed or accredited institutional setting. See 2012 Fla. ALS 197.

41.     However, the No-Fault Law was amended, effective January 1, 2013, to prohibit PIP reimbursement for massage or for services performed by massage therapists. See 2012 Fla. ALS 197; see also Fla. Stat. § 627.736(1)(a)(5)("Medical benefits [that are reimbursable under the No-Fault Law] do not include massage …,

regardless of the person, entity, or licensee providing massage …, and a licensed massage therapist … may not be reimbursed for medical benefits under this section.")

42.   The No-Fault Law was amended to prohibit PIP reimbursement for massage or for services performed by massage therapists in response to widespread PIP fraud involving massage services and massage therapists. See, e.g., Florida House of Representatives Staff Analysis for House Bill 119 (amending the No-Fault Law), noting that "PIP fraud remains rampant", and citing dramatic increases in PIP claims for massage therapy as a significant part of the problem.

43.   Pursuant to the Physical Therapy Act, massage therapists may not practice physical therapy, or hold themselves out as being able to practice physical therapy, unless they have an actual license to practice physical therapy, as opposed to massage therapy.

44.   The Physical Therapy Act also prohibits unlicensed individuals from practicing physical therapy. While the Physical Therapy Act does provide an exception to this rule that permits a physical therapist to delegate certain patient care activities an unlicensed assistant, that exception only applies if the unlicensed assistant works under the direct supervision of a physical therapist. See Fla. Stat. § 486.161(3).

45.   Health care practices in Florida may not collect PIP Benefits for any services performed by massage therapists, or for physical therapy services that are performed by unlicensed individuals without direct supervision by a licensed physical therapist.

**F.      No-Fault Reimbursement and Medical Necessity**

46.      Pursuant to the No-Fault Law, insurers such as GEICO are only required to pay PIP Benefits for medically necessary services. See Fla. Stat. § 627.736. At the same time, a health care services provider, including a clinic licensed under the Clinic Act, is only eligible to receive PIP Benefits for medically necessary services. Id.

47.      Pursuant to the No-Fault Law, "medically necessary" means:

a medical service or supply that a prudent physician would provide for the purpose of preventing, diagnosing, or treating an illness, injury, disease, or symptom in a manner that is:

(a) In accordance with generally accepted standards of medical practice;

(b) Clinically appropriate in terms of type, frequency, extent, site, and duration; and

(c) Not primarily for the convenience of the patient, physician, or other health care provider.

See Fla. Stat. § 627.732.

**G.      No-Fault Billing and No-Fault Reimbursement**

48.      Pursuant to the No-Fault Law, insurers such as GEICO are not required to pay PIP Benefits:

(i)      for any service or treatment that was not lawful at the time rendered;

(ii)     to any person who knowingly submits a false or misleading statement relating to the claim or charges;

(iii)    for any treatment or service that is upcoded; or

(iv)    with respect to a bill or statement that does not substantially meet the billing requirements set forth in the No-Fault Law.

See Fla. Stat. § 627.736.

49.     The No-Fault Law's billing requirements provide – among other things – that all PIP billing must, to the extent applicable, comply with the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms, as well as the guidelines promulgated by the American Medical Association ("AMA") in connection with the use of current procedural terminology ("CPT") codes. See Fla. Stat. § 627.736.

50.     By listing a health care practitioner in Box 31 of a HCFA-1500 form, the billing provider represents that the practitioner performed or directly supervised the underlying services, and "[t]o directly supervise, a doctor must be physically present at the facility". See Medicare Claims Processing Manual, Chapter 26, Item 31.

51.     Additionally, in order for a health care service to be eligible for PIP reimbursement, the applicable claim form must set forth the professional license number of the provider who personally performed or directly supervised the underlying health care service, in the line or space provided for "Signature of Physician or Supplier, Including Degrees or Credentials." See Fla. Stat. § 627.736.

II.     **The Defendants' Fraudulent and Unlawful Scheme**

52.     Since at least 2017, and continuing through the present day, the Defendants conceived and implemented a massive fraudulent scheme in which they billed GEICO and other Florida automobile insurers millions of dollars for medically unnecessary, illusory, unlawful, and otherwise non-reimbursable services.

15

**A.     Violations of the Clinic Act**

53.     As part of the Defendants' fraudulent and unlawful scheme, McClerren operated ATM Healthcare in pervasive violation of the Clinic Act.

54.     ATM Healthcare was a "clinic" within the meaning of the Clinic Act, in that it was an entity "where health care services are provided to individuals and which tender[ed] charges for reimbursement for such services".

55.     However, ATM Healthcare never had a clinic license or medical director.

56.     Instead, ATM Healthcare was – at all times – owned by McClerren, and purported to operate under the "wholly owned" exemption to the Clinic Act's licensing, operating, and medical director requirements.

57.     However, McClerren never legitimately supervised the business activities of ATM Healthcare, inasmuch as McClerren never conducted legitimate reviews of the billing or treatment records from ATM Healthcare to ensure that the billing was not fraudulent or unlawful, and never even made any attempt to remedy the fraudulent and unlawful charges submitted through ATM Healthcare, as described herein.

58.     To the contrary, McClerren participated in and directed the fraudulent and unlawful scheme described herein.

59.     Moreover, McClerren could not legitimately have supervised ATM Healthcare's business activities, because ATM Healthcare provided health care services, including medical services, that were beyond the scope of McClerren's chiropractic license.

60.     To the extent that McClerren ever had any kind of health care license, the only license he had was a chiropractic license. McClerren is not, and never has been, licensed as a physician.

61.     Even so, and in keeping with the fact that McClerren could not legitimately have supervised the business activities of ATM Healthcare, ATM Healthcare purported to provide medical services – such as medical examinations and pain management injections by the ATM Physicians and others – that were beyond the scope of McClerren's chiropractic license.

62.     Accordingly, ATM Healthcare operated in violation of the Clinic Act.

63.     In the claims identified in Exhibit "1", the Defendants' PIP charges were fraudulent and unlawful in that they misrepresented that ATM Healthcare was compliant with Florida law and eligible to receive PIP reimbursement in the first instance.

64.     In fact, ATM Healthcare never was compliant with Florida law or eligible to receive PIP reimbursement, because it operated in pervasive violation of the Clinic Act.

**B.      The Fraudulent and Unlawful Billing for Services Performed by Massage Therapists**

65.     What is more, and in keeping with the fact that McClerren did not legitimately supervise the business activities of ATM Healthcare, many of the purported "physical therapy" services in the claims identified in Exhibit "1" were unlawfully performed – to the extent they were performed at all – by massage therapists

17

including Kimberly Castaneda, LMT ("Castaneda"), Katie Booth, LMT ("Booth"), Carmelo Pinero, LMT ("Pinero"), and Alex Porro, LMT ("Porro"), as well as unsupervised unlicensed individuals, including Sharon Ferguson ("Ferguson").

66.     The Defendants were aware of the fact that ATM Healthcare could not legally recover PIP Benefits for services performed by massage therapists or unsupervised unlicensed individuals.

67.     As a result, and in order to conceal the fact that Castaneda, Booth, Pinero, Porro, Ferguson, and other massage therapists and unsupervised/unlicensed individuals performed the purported physical therapy services that were unlawfully billed through ATM Healthcare to GEICO, the Defendants deliberately omitted any reference to Castaneda, Booth, Pinero, Porro, Ferguson, and other massage therapists and unlicensed individuals associated with ATM Healthcare on the HCFA-1500 forms that they used to bill for the putative physical therapy services.

68.     Instead, in the claims for physical therapy services identified in Exhibit "1", the Defendants routinely falsely listed McClerren, the ATM Chiropractors, or the ATM Physicians on the HCFA-1500 forms as the supposed providers or direct supervisors of the physical therapy services.

69.     In the claims for the "physical therapy" services identified in Exhibit "1", the Defendants routinely fraudulently misrepresented that the physical therapy services were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the purported physical therapy services were performed – to the extent they were performed at all – by massage therapists and unsupervised/unlicensed individuals, in contravention of Florida law;

(ii)    ATM Healthcare could not lawfully recover PIP Benefits for the purported physical therapy services, because they were performed by massage therapists and unsupervised/unlicensed individuals; and

(iii)   the Defendants systematically fraudulently misrepresented and concealed the identities of the individuals who either personally performed or directly supervised the putative physical therapy services.

70.     In this context, McClerren – who at all relevant times purported to own ATM Healthcare – did not, and could not have legitimately supervised the business activities of ATM Healthcare.

71.     Had McClerren actually supervised the business activities of ATM Healthcare, McClerren would have noted – among other things – that physical therapy services at ATM Healthcare were unlawfully performed by massage therapists and unsupervised/unlicensed individuals, and unlawfully billed to GEICO.

## C.   The Defendants' Unlawful General Business Practice of Failing to Make a Good-Faith Effort to Collect Co-Payments or Deductibles from Their Patients

72.     During the relevant time period, the Defendants unlawfully engaged in the general business practice of waiving, or failing to make a good-faith effort to collect, co-payments and deductibles from their patients in violation of the False and Fraudulent Insurance Claims statute.

73.     In keeping with this fact, in virtually all of the thousands of bills (i.e., the HCFA-1500 forms) submitted through ATM Healthcare to GEICO for the

Defendants' Fraudulent Services, the Defendants represented that they did not collect any money, whether it be a co-payment or a deductible, from the patient.

74.     In the claims identified in Exhibit "1", the Defendants routinely falsely represented that the underlying health care services were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable because the Defendants engaged in the general business practice of waiving, or failing to make a good-faith effort to collect, co-payments and deductibles from their patients in violation of the False and Fraudulent Insurance Claims statute.

**D.     The Defendants' Fraudulent Treatment and Billing Protocol**

75.     Most of the Insureds whom the Defendants purported to treat were involved in relatively minor accidents. At the same time, almost none of the Insureds whom the Defendants purported to treat suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced.

76.     Even so, the Defendants subjected the Insureds to a medically unnecessary course of "treatment" that was provided pursuant to a pre-determined, fraudulent protocol.

77.     This pre-determined, fraudulent protocol was designed to maximize the billing that the Defendants could submit to insurers, including GEICO, not to benefit the Insureds who were subjected to it.

78.     The Defendants provided their pre-determined fraudulent treatment protocol to Insureds without regard for the Insureds' individual symptoms or

presentation, or – in many cases – the total absence of any actual continuing medical problems arising from any automobile accidents.

79.     Each step in the Defendants' fraudulent treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent PIP billing for each Insured.

80.     No legitimate chiropractor, physician, or clinic would permit the fraudulent treatment and billing protocol described below to proceed under his, her, or its auspices.

81.     The Defendants permitted the fraudulent treatment and billing protocol described below to proceed under their auspices because they sought to continue profiting from their fraudulent scheme.

## 1.     General Requirements for Patient Examinations Billed Under CPT Codes 99203, 99204, 99213, and 99214

82.     As set forth above, the No-Fault Law's billing requirements provide that all PIP billing must – among other things – comply with the guidelines promulgated by the AMA in connection with the use of current procedural terminology, or CPT, codes. See Fla. Stat. § 627.736.

83.     The primary guidelines promulgated by the AMA for the use of CPT codes are contained in the AMA's CPT Assistant.

**(i)      CPT Code 99203**

84.    Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for an initial patient examination typically represented that the patient presented with problems of moderate severity.

85.    The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately severe, and thereby justify the use of CPT code 99203 to bill for an initial patient examination.

86.    For example, the CPT Assistant provides the following clinical examples of presenting problems that might support the use of CPT code 99203 to bill for an initial patient examination:

(i)      Office visit for initial evaluation of a 48-year-old man with recurrent low back pain radiating to the leg. (General Surgery)

(ii)     Initial office evaluation of 49-year-old male with nasal obstruction. Detailed exam with topical anesthesia. (Plastic Surgery)

(iii)    Initial office evaluation for diagnosis and management of painless gross hematuria in new patient, without cystoscopy. (Internal Medicine)

(iv)    Initial office visit for evaluation of 13-year-old female with progressive scoliosis. (Physical Medicine and Rehabilitation)

(v)     Initial office visit with couple for counseling concerning voluntary vasectomy for sterility Spent 30 minutes discussing procedure, risks and benefits, and answering questions. (Urology)

87.    Thus, pursuant to the CPT Assistant, the moderately severe presenting problems that could support the use of CPT code 99203 to bill for an initial patient examination typically are either chronic and relatively serious problems, acute

problems requiring immediate invasive treatment, or issues that legitimately require physician counseling.

88.     Moreover, pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination represented that the physician or chiropractor who performed the examination spent at least 30 minutes of face-to-face time with the patient or the patient's family.

89.     Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination also represented that the physician or chiropractor who performed the examination conducted a "detailed" physical examination.

90.     Pursuant to the CPT Assistant, a "detailed" physical examination requires – among other things – that the physician or chiropractor conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

91.     To the extent that the Insureds in the claims identified in Exhibit "1" had any actual complaints at all as the result of their relatively minor automobile accidents, the complaints were limited to minor musculoskeletal complaints.

92.     Pursuant to the CPT Assistant, in the context of patient examinations, a physician or chiropractor has not conducted an extended examination of a patient's musculoskeletal organ system unless the physician or chiropractor has documented findings with respect to the following:

(i)     measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii)    general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

(iii)    examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin and/or other location;

(v)    brief assessment of mental status;

(vi)    examination of gait and station;

(vii)    inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii)    coordination;

(ix)    examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and

(x)    examination of sensation.

93.    Moreover, pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination represented that the physician or chiropractor who performed the examination engaged in legitimate "low complexity" medical decision-making.

**(ii)    CPT Code 99204**

94.    Pursuant to the CPT Assistant, the use of CPT code 99204 to bill for an initial examination typically represented that the patient presented with problems of moderate to high severity.

95.     The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately to highly severe, and thereby justify the use of CPT code 99204 to bill for an initial patient examination.

96.     For example, the CPT Assistant provides the following clinical examples of presenting problems that support the use of CPT code 99204 to bill for an initial patient examination:

(i)     Office visit for initial evaluation of a 63-year-old male with chest pain on exertion. (Cardiology/Internal Medicine)

(ii)    Initial office visit of a 50-year-old female with progressive solid food dysphagia. (Gastroenterology)

(iii)   Initial office evaluation of a 70-year-old patient with recent onset of episodic confusion. (Internal Medicine)

(iv)    Initial office visit for 34-year-old patient with primary infertility, including counseling. (Obstetrics/Gynecology)

(v)     Initial office visit for 7-year-old female with juvenile diabetes mellitus, new to area, past history of hospitalization times three. (Pediatrics)

(vi)    Initial office evaluation of 70-year-old female with polyarthralgia. (Rheumatology)

(vii)   Initial office evaluation of a 50-year-old male with an aortic aneurysm with respect to recommendation for surgery. (Thoracic Surgery)

97.     Accordingly, pursuant to the CPT Assistant, the moderately to highly severe presenting problems that could support the use of CPT code 99204 to bill for an initial patient examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

98.     Moreover, pursuant to the CPT Assistant, the use of CPT code 99204 to bill for a patient examination represented that the physician or chiropractor who performed the examination spent at least 45 minutes of face-to-face time with the patient or the patient's family.

99.     Pursuant to the CPT Assistant, the use of CPT code 99204 to bill for a patient examination also represented that the physician or chiropractor who performed the examination conducted a "comprehensive" physical examination.

100.    Pursuant to the CPT Assistant, a physical examination does not qualify as "comprehensive" unless the examining physician or chiropractor either: (i) conducts a general examination of multiple patient organ systems; or (ii) conducts a complete examination of a single patient organ system.

101.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician or chiropractor has not conducted a general examination of multiple patient organ systems unless the physician or chiropractor has documented findings with respect to at least eight organ systems.

102.    The CPT Assistant recognizes the following organ systems:

(i)      constitutional symptoms (e.g., fever, weight loss);

(ii)     eyes;

(iii)    ears, nose, mouth, throat;

(iv)     cardiovascular;

(v)      respiratory;

(vi)     gastrointestinal;

(vii)  genitourinary;

(viii)  musculoskeletal;

(ix)  integumentary (skin and/or breast);

(x)  neurological;

(xi)  psychiatric;

(xii)  endocrine;

(xiii)  hematologic/lymphatic; and

(xiv)  allergic/immunologic.

103.  Pursuant to the CPT Assistant, in the context of patient examinations, a physician or chiropractor has not conducted a complete examination of a patient's musculoskeletal organ system unless the physician or chiropractor has documented findings with respect to:

(i)  at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)  the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)  examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)  palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)  examination of gait and station;

(vi)  examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)   inspection and palpation of skin and subcutaneous tissue (<u>e.g.</u>, scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)  coordination, deep tendon reflexes, and sensation; and

(ix)   mental status, including orientation to time, place and person, as well as mood and affect.

104.   Additionally, pursuant to the CPT Assistant, the use of CPT code 99204 to bill for a patient examination represented that the physician or chiropractor who performed the examination engaged in legitimate "moderate complexity" medical decision-making.

**(iii)   CPT Code 99213**

105.   Pursuant to the CPT Assistant, the use of CPT code 99213 to bill for a follow-up examination typically required that the patient presented with problems of low to moderate severity.

106.   The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as problems of low to moderate severity, and thereby justify the use of CPT code 99213 to bill for a follow-up patient examination.

107.   For example, the CPT Assistant provides the following clinical examples of presenting problems that might qualify as problems of low to moderate severity, and therefore support the use of CPT code 99213 to bill for a follow-up patient examination:

(i)    Follow-up visit with 55-year-old male for management of hypertension, mild fatigue, on beta blocker/thiazide regimen. (Family Medicine/Internal Medicine)

(ii)   Follow-up office visit for an established patient with stable cirrhosis of the liver. (Gastroenterology)

(iii)  Outpatient visit with 37-year-old male, established patient, who is 3 years post total colectomy for chronic ulcerative colitis, presents for increased irritation at his stoma. (General Surgery)

(iv)   Routine, follow-up office evaluation at a three-month interval for a 77-year-old female with nodular small cleaved-cell lymphoma. (Hematology/Oncology)

(v)    Follow-up visit for a 70-year-old diabetic hypertensive patient with recent change in insulin requirement. (Internal Medicine/Nephrology)

(vi)   Quarterly follow-up office visit for a 45-year-old male, with stable chronic asthma, on steroid and bronchodilator therapy. (Pulmonary Medicine)

(vii)  Office visit with 80-year-old female established patient, for follow-up osteoporosis, status-post compression fractures. (Rheumatology)

108.   Pursuant to the CPT Assistant, the use of CPT code 99213 to bill for a follow-up examination also represented that the examining physician or chiropractor performed at least two of the following three tasks during the examination: (a) took an "expanded problem focused" patient history; (b) conducted an "expanded problem focused physical examination"; and (c) engaged in medical decision-making of "low complexity".

**(iv)  CPT Code 99214**

109.   Pursuant to the CPT Assistant, the use of CPT code 99214 to bill for a follow-up examination typically represented that the patient presented with problems of moderate to high severity.

29

110.    The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately to highly severe, and thereby justify the use of CPT code 99214 to bill for a follow-up patient examination.

111.    For example, the CPT Assistant provides the following clinical examples of presenting problems that might support the use of CPT code 99214 to bill for a follow-up patient examination:

(i)     Office visit for a 68-year-old male with stable angina, two months post myocardial infarction, who is not tolerating one of his medications. (Cardiology)

(ii)    Office evaluation of 28-year-old patient with regional enteritis, diarrhea and low-grade fever, established patient. (Family Medicine/Internal Medicine)

(iii)   Weekly office visit for 5FU therapy for an ambulatory established patient with metastatic colon cancer and increasing shortness of breath. (Hematology/Oncology)

(iv)    Office visit with 50-year-old female, established patient, diabetic, blood sugar controlled by diet. She now complains of frequency of urination and weight loss, blood sugar of 320 and negative ketones on dipstick. (Internal Medicine)

(v)     Follow-up visit for a 60-year-old male whose post-traumatic seizures have disappeared on medication, and who now raises the question of stopping the medication. (Neurology)

(vi)    Follow-up office visit for a 45-year-old patient with rheumatoid arthritis on gold, methotrexate, or immunosuppressive therapy. (Rheumatology)

(vii)   Office evaluation on new onset RLQ pain in a 32-year-old woman, established patient. (Urology/General Surgery/Internal Medicine/Family Medicine)

(viii)  Office visit with 63-year-old female, established patient, with familial polyposis, after a previous colectomy and sphincter sparing procedure,

now with tenesmus, mucus, and increased stool frequency. (Colon and Rectal Surgery)

**2.    The Fraudulent Treatment and Billing Protocol at ATM Healthcare**

**(i)    The Fraudulent Charges for Initial Examinations at ATM Healthcare**

112.   As an initial step in their fraudulent treatment and billing protocol, the Defendants purported to provide each of the Insureds in the claims identified in Exhibit "1" with an initial examination.

113.   As set forth in Exhibit "1", the Defendants then billed many of the initial examinations to GEICO, or caused them to be billed to GEICO, under CPT Code 99203, typically resulting in a charge of between $267.92 to $452.80 for each initial examination that they purported to provide.

114.    As set forth in Exhibit "1", the Defendants also billed many of their purported initial examinations to GEICO, or caused them to be billed to GEICO, under CPT code 99204, typically resulting in a charge of between $272.95 or $675.32 for each initial examination they purported to provide.

115.   In the claims for initial examinations identified in Exhibit "1", the charges for the initial examinations were fraudulent in that they misrepresented that ATM Healthcare was eligible to collect PIP benefits in the first instance.

116.   In fact, and as set forth above, ATM Healthcare was never eligible to collect PIP benefits, inasmuch as it operated in violation of the Clinic Act, the False and Fraudulent Insurance Claims statute, and the Physical Therapy Act.

117.   As set forth below, the charges for the initial examinations identified in Exhibit "1" also were fraudulent in that they misrepresented the nature, extent, and results of the initial examinations.

**a.   Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

118.   To the extent that the Insureds in the claims identified in Exhibit "1" had any presenting problems at all as the result of their relatively minor automobile accidents, the problems virtually always were low or minimal severity soft tissue injuries such as sprains or strains.

119.   For instance, and in keeping with the fact that the Insureds in the claims identified in Exhibit "1" either had no presenting problems at all as the result of their relatively minor automobile accidents, or else problems of low or minimal severity, in many of the claims identified in Exhibit "1" the contemporaneous police reports indicated that the underlying accidents involved relatively low-impact collisions, that the Insureds' vehicles were drivable following the accidents, and that no one was seriously injured in the underlying accidents, or injured at all.

120.   What is more, in most of the claims identified in Exhibit "1" the Insureds did not seek treatment at any hospital as the result of their accidents.

121.   To the limited extent that the Insureds in the claims identified in Exhibit "1" did seek treatment at a hospital following their accidents, they almost always were briefly observed on an outpatient basis, and then discharged with nothing more serious than a minor soft tissue injury diagnosis.

122.   Even so, in the claims for initial examinations identified in Exhibit "1", the Defendants routinely billed for their putative examinations using CPT Code 99203, and thereby falsely represented that the Insureds presented with problems of moderate severity.

123.   For example:

(i)   On October 17, 2016 an Insured named BB was involved in an automobile accident. The contemporaneous police report indicated that the airbags in BB's vehicle did not deploy and that BB's vehicle was drivable following the accident. The police report further indicated that BB did not complain of any pain at the scene of the accident. In keeping with the fact that BB was not seriously injured in the accident, BB did not visit any hospital emergency room following the accident. To the extent that BB experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of BB on October 17, 2016, ATM Healthcare, McClerren, and John billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(ii)   On January 3, 2017, an Insured named AN was involved in an automobile accident. The contemporaneous police report indicated that the airbags in AN's vehicle did not deploy. The police report further indicated that AN did not complain of any pain at the scene of the accident. In keeping with the fact that AN was not seriously injured in the accident, AN did not visit any hospital emergency room following the accident. To the extent that AN experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of AN on January 5, 2017, ATM Healthcare, McClerren, and Lowery billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(iii)   On January 16, 2017, an Insured named KN was involved in an automobile accident. The contemporaneous police report indicated that the airbags in KN's vehicle did not deploy. The police report further indicated that KN did not complain of any pain at the scene of the accident. In keeping with the fact that KN was not seriously injured in the accident, KN did not visit any hospital emergency room following

the accident. To the extent that KN experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of KN on March 13, 2017, ATM Healthcare, McClerren, and Lowery billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(iv)   On March 20, 2017 an Insured named DP was involved in an automobile accident. The contemporaneous police report indicated that the airbags in DP's vehicle did not deploy and that DP's vehicle was drivable following the accident. The police report further indicated that DP did not complain of any pain at the scene of the accident. In keeping with the fact that DP was not seriously injured in the accident, DP did not visit any hospital emergency room following the accident. To the extent that DP experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of DP on March 24, 2017, ATM Healthcare, McClerren, and Lowery billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(v)   On June 29, 2017 an Insured named CD was involved in an automobile accident. The contemporaneous police report indicated that the airbags in CD's vehicle did not deploy and that CD's vehicle was drivable following the accident. The police report further indicated that CD did not complain of any pain at the scene of the accident. In keeping with the fact that CD was not seriously injured in the accident, CD did not visit any hospital emergency room following the accident. To the extent that CD experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of CD on July 24, 2017, ATM Healthcare and McClerren billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(vi)   On September 28, 2017 an Insured named TB was involved in an automobile accident. The contemporaneous police report indicated that the airbags in TB's vehicle did not deploy and that TB's vehicle was drivable following the accident. The police report further indicated that TB did not complain of any pain at the scene of the accident. In keeping with the fact that TB was not seriously injured in the accident, TB did not visit any hospital emergency room following the accident. To the extent that TB experienced any health problems at all as a result of the accident,

they were of low or minimal severity. Even so, following a purported initial examination of TB on October 5, 2017, ATM Healthcare, McClerren, and Bloom billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(vii)   On October 4, 2017 an Insured named AH was involved in an automobile accident. The contemporaneous police report indicated that the airbags in AH's vehicle did not deploy and that AH's vehicle was drivable following the accident. The police report further indicated that AH did not complain of any pain at the scene of the accident. In keeping with the fact that AH was not seriously injured in the accident, AH visited University of Florida Hospital a day after the accident, where he was briefly observed on an outpatient basis and discharged with nothing more serious than a contusion of his scalp. To the extent that AH experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of AH on October 16, 2017, ATM Healthcare, McClerren, and Bloom billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(viii)  On November 7, 2018 an Insured named YY was involved in an automobile accident. The contemporaneous police report indicated that the airbags in YY's vehicle did not deploy and that YY's vehicle was drivable following the accident. The police report further indicated that YY did not complain of any pain at the scene of the accident. In keeping with the fact that YY was not seriously injured in the accident, YY did not visit any hospital emergency room following the accident. To the extent that YY experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of YY on November 8, 2018, ATM Healthcare, McClerren, and Lowery billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(ix)    On December 11, 2018 an Insured named IE was involved in an automobile accident. The contemporaneous police report indicated that the airbags in IE's vehicle did not deploy and that IE's vehicle was drivable following the accident. The police report further indicated that IE did not complain of any pain at the scene of the accident. In keeping with the fact that IE was not seriously injured in the accident, IE did not visit any hospital emergency room following the accident. To the extent

that IE experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of IE on December 18, 2018, ATM Healthcare, McClerren, and Lowery billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(x)     On March 12, 2019, an Insured named MC was involved in an automobile accident. The contemporaneous police report indicated that the airbags in MC's vehicle did not deploy and that MC's vehicle was drivable following the accident. The police report further indicated that MC did not complain of any pain at the scene of the accident. In keeping with the fact that MC was not seriously injured in the accident, MC did not visit any hospital emergency room following the accident. To the extent that MC experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of MC on March 14, 2019, ATM Healthcare, McClerren, and Steelman billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xi)    On July 17, 2019, an Insured named AD was involved in an automobile accident. The contemporaneous police report indicated that the airbags in AD's vehicle did not deploy and that AD's vehicle was drivable following the accident. The police report further indicated that AD did not complain of any pain at the scene of the accident. In keeping with the fact that AD was not seriously injured in the accident, AD did not visit any hospital emergency room following the accident. To the extent that AD experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of AD on July 30, 2019, ATM Healthcare, McClerren, and Francis billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xii)   On August 13, 2019, an Insured named LM was involved in an automobile accident. The contemporaneous police report indicated that the airbags in LM's vehicle did not deploy and that LM's vehicle was drivable following the accident. The police report further indicated that LM did not complain of any pain at the scene of the accident. In keeping with the fact that LM was not seriously injured in the accident, LM did not visit any hospital emergency room following the accident. To the extent that LM experienced any health problems at all as a result of the

accident, they were of low or minimal severity. Even so, following a purported initial examination of LM on August 27, 2019, ATM Healthcare, McClerren, and Mead billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xiii)   On January 15, 2020 an Insured named TS was involved in an automobile accident. The contemporaneous police report indicated that the airbags in TS's vehicle did not deploy and that TS's vehicle was drivable following the accident. The police report further indicated that TS did not complain of any pain at the scene of the accident. In keeping with the fact that TS was not seriously injured in the accident, TS did not visit any hospital emergency room following the accident. To the extent that TS experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of TS on January 17, 2020, ATM Healthcare, McClerren, and Mead billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xiv)   On March 3, 2020 an Insured named WN was involved in an automobile accident. The contemporaneous police report indicated that the airbags in WN's vehicle did not deploy and that WN's vehicle was drivable following the accident. The police report further indicated that WN did not complain of any pain at the scene of the accident. In keeping with the fact that WN was not seriously injured in the accident, WN did not visit any hospital emergency room following the accident. To the extent that WN experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of WN on March 6, 2020, ATM Healthcare, McClerren, and Francis billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xv)   On August 6, 2020 an Insured named SP was involved in an automobile accident. The contemporaneous police report indicated that the airbags in SP's vehicle did not deploy and that SP's vehicle was drivable following the accident. The police report further indicated that SP did not complain of any pain at the scene of the accident. In keeping with the fact that SP was not seriously injured in the accident, SP did not visit any hospital emergency room following the accident. To the extent that SP experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial

examination of SP on August 12, 2020, ATM Healthcare, McClerren, and Mead billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xvi)   On February 9, 2022 an Insured named DB was involved in an automobile accident. The contemporaneous police report indicated that the airbags in DB's vehicle did not deploy and that DB's vehicle was drivable following the accident. The police report further indicated that DB did not complain of any pain at the scene of the accident. In keeping with the fact that DB was not seriously injured in the accident, DB did not visit any hospital emergency room following the accident. To the extent that DB experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of DB on February 11, 2022, ATM Healthcare, McClerren, and Mendez billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xvii)  On April 25, 2022 an Insured named MT was involved in an automobile accident. The contemporaneous police report indicated that the airbags in MT's vehicle did not deploy and that MT's vehicle was drivable following the accident. The police report further indicated that MT did not complain of any pain at the scene of the accident. In keeping with the fact that MT was not seriously injured in the accident, MT did not visit any hospital emergency room following the accident. To the extent that MT experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of MT on April 29, 2022, ATM Healthcare, McClerren, and Mendez billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xviii) On September 1, 2022 an Insured named MM was involved in an automobile accident. The contemporaneous police report indicated that the airbags in MM's vehicle did not deploy and that MM's vehicle was drivable following the accident. The police report further indicated that MM did not complain of any pain at the scene of the accident. In keeping with the fact that MM was not seriously injured in the accident, MM did not visit any hospital emergency room following the accident. To the extent that MM experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of MM on September 2, 2022, ATM

Healthcare, McClerren, and Lowery billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xix)   On January 20, 2023 an Insured named JM was involved in an automobile accident. The contemporaneous police report indicated that the airbags in JM's vehicle did not deploy and that JM's vehicle was drivable following the accident. The police report further indicated that JM did not complain of any pain at the scene of the accident. In keeping with the fact that JM was not seriously injured in the accident, JM did not visit any hospital emergency room following the accident. To the extent that JM experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of JM on January 20, 2023, ATM Healthcare, McClerren, and Mendez billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xx)   On January 31, 2023 an Insured named DS was involved in an automobile accident. The contemporaneous police report indicated that the airbags in DS's vehicle did not deploy and that DS's vehicle was drivable following the accident. The police report further indicated that DS did not complain of any pain at the scene of the accident. In keeping with the fact that DS was not seriously injured in the accident, DS did not visit any hospital emergency room following the accident. To the extent that DS experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of DS on January 31, 2023, ATM Healthcare, McClerren, and Mendez billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

124.   These are only representative examples. In the claims for initial examinations identified in Exhibit "1", the Defendants routinely falsely represented that the Insureds presented with problems of moderate severity, when in fact the Insureds' problems were low or minimal severity soft tissue injuries such as sprains and strains, to the extent that they had any presenting problems at all as the result of their accidents.

125.    Similarly, in the claims for initial examinations identified in Exhibit "1", the Defendants routinely billed for their putative examinations using CPT Code 99204, and thereby falsely represented that the Insureds presented with problems of moderate to high severity.

126.    For example:

(i)      On January 16, 2017, an Insured named KN was involved in an automobile accident. The contemporaneous police report indicated that the airbags in KN's vehicle did not deploy. The police report further indicated that KN did not complain of any pain at the scene of the accident. In keeping with the fact that KN was not seriously injured in the accident, KN did not visit any hospital emergency room following the accident. To the extent that KN experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of KN on March 16, 2017, ATM Healthcare, McClerren, and Malcolm billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the examination involved moderate to high severity presenting problems.

(ii)     On June 23, 2017 an Insured named CC was involved in an automobile accident. The contemporaneous police report indicated that the airbags in CC's vehicle did not deploy and that CC's vehicle was drivable following the accident. The police report further indicated that CC did not complain of any pain at the scene of the accident. In keeping with the fact that CC was not seriously injured in the accident, CC did not visit any hospital emergency room following the accident. To the extent that CC experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of CC on June 26, 2017, ATM Healthcare, McClerren, and Herrild billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the examination involved moderate to high severity presenting problems.

(iii)    On June 29, 2017 an Insured named CD was involved in an automobile accident. The contemporaneous police report indicated that the airbags in CD's vehicle did not deploy and that CD's vehicle was drivable following the accident. The police report further indicated that CD did not complain of any pain at the scene of the accident. In keeping with the fact that CD was not seriously injured in the accident, CD did not visit

any hospital emergency room following the accident. To the extent that CD experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of CD on July 27, 2017, ATM Healthcare, McClerren, and Lee billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the examination involved moderate to high severity presenting problems.

(iv)     On July 18, 2017 an Insured named VC was involved in an automobile accident. The contemporaneous police report indicated that the airbags in VC's vehicle did not deploy and that VC's vehicle was drivable following the accident. The police report further indicated that VC did not complain of any pain at the scene of the accident. In keeping with the fact that VC was not seriously injured in the accident, VC visited St Vincent's Hospital where she was briefly observed on an outpatient basis and was discharged with nothing more than soft tissue strain diagnoses. To the extent that VC experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of VC on July 25, 2017, ATM Healthcare, McClerren, and Malcolm billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the examination involved moderate to high severity presenting problems.

(v)     On September 22, 2017 an Insured named HH was involved in an automobile accident. The contemporaneous police report indicated that the airbags in HH's vehicle did not deploy and that HH's vehicle was drivable following the accident. The police report further indicated that HH did not complain of any pain at the scene of the accident. In keeping with the fact that HH was not seriously injured in the accident, HH did not visit any hospital emergency room following the accident. To the extent that HH experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of HH on November 9, 2017, ATM Healthcare, McClerren, and Lee billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the examination involved moderate to high severity presenting problems.

(vi)     On September 28, 2017 an Insured named TB was involved in an automobile accident. The contemporaneous police report indicated that the airbags in TB's vehicle did not deploy and that TB's vehicle was drivable following the accident. The police report further indicated that TB did not complain of any pain at the scene of the accident. In keeping with the fact that TB was not seriously injured in the accident, TB did not

41

visit any hospital emergency room following the accident. To the extent that TB experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of TB on October 9, 2017, ATM Healthcare, McClerren, and Malcolm billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the examination involved moderate to high severity presenting problems.

(vii)   On October 4, 2017 an Insured named AH was involved in an automobile accident. The contemporaneous police report indicated that the airbags in AH's vehicle did not deploy and that AH's vehicle was drivable following the accident. The police report further indicated that AH did not complain of any pain at the scene of the accident. In keeping with the fact that AH was not seriously injured in the accident, AH visited University of Florida Hospital a day after the accident, where he was briefly observed on an outpatient basis and discharged with nothing more serious than a contusion of his scalp. To the extent that AH experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of AH on October 17, 2017, ATM Healthcare, McClerren, and Malcolm billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the examination involved moderate to high severity presenting problems.

(viii)  On November 7, 2018 an Insured named YY was involved in an automobile accident. The contemporaneous police report indicated that the airbags in YY's vehicle did not deploy and that YY's vehicle was drivable following the accident. The police report further indicated that YY did not complain of any pain at the scene of the accident. In keeping with the fact that YY was not seriously injured in the accident, YY did not visit any hospital emergency room following the accident. To the extent that YY experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of YY on November 8, 2018, ATM Healthcare, McClerren, and Lee billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the examination involved moderate to high severity presenting problems.

(ix)    On December 11, 2018 an Insured named IE was involved in an automobile accident. The contemporaneous police report indicated that the airbags in IE's vehicle did not deploy and that IE's vehicle was drivable following the accident. The police report further indicated that IE did not complain of any pain at the scene of the accident. In keeping

with the fact that IE was not seriously injured in the accident, IE did not visit any hospital emergency room following the accident. To the extent that IE experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of IE on December 20, 2018, ATM Healthcare, McClerren, and Lee billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the examination involved moderate to high severity presenting problems.

(x)  On March 12, 2019, an Insured named MC was involved in an automobile accident. The contemporaneous police report indicated that the airbags in MC's vehicle did not deploy and that MC's vehicle was drivable following the accident. The police report further indicated that MC did not complain of any pain at the scene of the accident. In keeping with the fact that MC was not seriously injured in the accident, MC did not visit any hospital emergency room following the accident. To the extent that MC experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of MC on March 14, 2019, ATM Healthcare, McClerren, and Lee billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the examination involved moderate to high severity presenting problems.

127. These are only representative examples. In the claims for initial examinations identified in Exhibit "1", McClerren and ATM Healthcare routinely billed for their purported examinations using CPT Code 99204, and thereby falsely represented that the Insureds presented with problems of moderate to high severity, when in fact the Insureds' problems were low or minimal severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all as the result of any automobile accidents.

128. In the claims for initial examinations identified in Exhibit "1", the Defendants routinely falsely represented that the Insureds presented with problems of moderate or moderate to high severity in order to create a false basis for their charges

for the examinations under CPT codes 99203 and 99204, because examinations billable under CPT codes 99203 and 99204 are reimbursable at higher rates than examinations involving presenting problems of low severity, minimal severity, or no severity.

129.    In the claims for initial examinations identified in Exhibit "1", the Defendants also routinely falsely represented that the Insureds presented with problems of moderate or moderate to high severity in order to create a false basis for the laundry list of other Fraudulent Services that the Defendants purported to provide to the Insureds.

**b.    Misrepresentations Regarding the Amount of Time Spent on the Initial Examinations**

130.    What is more, in the claims identified in Exhibit "1", the charges for the initial examinations under CPT code 99203 misrepresented and exaggerated the amount of face-to-face time that the examining physician or chiropractor spent with the Insureds or the Insureds' families.

131.    As set forth in Exhibit "1", the Defendants often billed for their putative initial examinations using CPT code 99203, and thereby represented that the physician or chiropractor who purported to conduct the examinations spent at least 30 minutes of face-to-face time with the Insureds or their families during the examinations.

132.    Moreover, as set forth in Exhibit "1", the Defendants also billed for many of their putative initial examinations using CPT code 99204, and thereby represented that the physicians who purported to conduct the examinations spent at least 45

minutes of face-to-face time with the Insureds or their families during the examinations.

133. In fact, in the initial examinations identified in Exhibit "1", the physicians and chiropractors who purported to perform the initial examinations on behalf of ATM Healthcare almost never spent more than 15-20 minutes of face-to-face time with the Insureds or their families when conducting the examinations, much less 30 or 45 minutes.

134. In keeping with the fact that the initial examinations in the claims identified in Exhibit "1" did not involve more than 15-20 minutes of face-to-face time with the Insureds, or the Insureds' families, to the extent that they were provided at all, McClerren, the ATM Physicians, the ATM Chiropractors, and the ATM Nurses used template forms in conducting the examinations.

135. All that was required to complete the template forms was a brief patient interview and a perfunctory physical examination of the Insureds, using a limited range of examination parameters.

136. These interviews and examinations did not require McClerren, the ATM Physicians, the ATM Chiropractors, the ATM Nurses, or any other health care providers associated with ATM Healthcare to spend more than 15-20 minutes of face-to-face time with the Insureds during the putative initial examinations.

137. In the claims for initial examinations that are identified in Exhibit "1", the Defendants routinely misrepresented the amount of time that was spent in conducting the initial examinations because lengthier examinations that are billable

under CPT codes 99203 and 99204 are reimbursable at higher rates than examinations that take less time to perform.

### c.    Misrepresentations Regarding the Extent of Medical Decision-Making

138.    Pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

139.    As set forth above, and in Exhibit "1", most of the initial examinations that the Defendants billed through ATM Healthcare to GEICO were billed under CPT code 99203, which represented that the examining physicians or chiropractors engaged in some genuine, low-complexity medical decision-making during the initial examinations.

140.    Moreover, as set forth above, and in Exhibit "1", many of the initial examinations billed through ATM Healthcare to GEICO were billed under CPT code 99204, which represented that the examining physicians engaged in some genuine, moderate-complexity medical decision-making during the initial examinations.

141.    In actuality, however, the purported initial examinations did not involve any legitimate medical decision-making at all.

46

142.   First, in the claims for initial examinations identified in Exhibit "1", the initial examinations did not involve the retrieval, review, or analysis of a significant amount of medical records, diagnostic tests, or other information.

143.   When the Insureds in the claims identified in Exhibit "1" presented to ATM Healthcare for "treatment", they did not arrive with any significant amount of medical records.

144.   Second, in the claims for initial examinations identified in Exhibit "1", there was no risk of significant complications or morbidity – much less mortality – from the Insureds' minor soft-tissue injury complaints, to the extent that they actually presented with any ongoing complaints arising from automobile accidents at all.

145.   Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided at ATM Healthcare, to the extent that ATM Healthcare provided any such diagnostic procedures or treatment options in the first instance.

146.   In virtually all of the claims identified in Exhibit "1", any diagnostic procedures and "treatments" that the Defendants actually provided were limited to a series of medically unnecessary follow-up examinations, chiropractic treatments, physical therapy treatments, and pain management treatments, none of which was health- or life-threatening if properly administered.

147.   Third, in the claims for initial examinations identified in Exhibit "1", the ATM Physicians, ATM Chiropractors, ATM Nurses, and McClerren did not consider

any significant number of diagnoses or treatment options for Insureds during the initial examinations.

148.   Rather, to the extent that the initial examinations were conducted in the first instance, McClerren, the ATM Physicians, ATM Chiropractors, and ATM Nurses provided a nearly identical, pre-determined set of phony, objectively unverifiable soft tissue injury "diagnoses" for the Insureds, and a substantially similar course of treatment for the Insureds.

149.   Specifically, in the claims identified in Exhibit "1", during the initial examinations the Insureds routinely did not report any continuing significant medical problems that legitimately could be traced to an underlying automobile accident.

150.   Even so, the Defendants, and the ATM Nurses, ATM Physicians, and ATM Chiropractors working at the Defendants' direction, prepared initial examination reports in which they provided false, boilerplate, objectively unverifiable soft tissue injury "diagnoses" to virtually every Insured.

151.   Then, based upon these false "diagnoses", the Defendants caused virtually every Insured to receive significant and medically unnecessary physical therapy treatment and, in some cases at ATM Healthcare, nerve conduction studies, ESWT, and pain management injections.

152.   For example:

(i)   On October 17, 2016 an Insured named BB was involved in an automobile accident. The contemporaneous police report indicated that the airbags in BB's vehicle did not deploy and that BB's vehicle was drivable following the accident. The police report further indicated that BB did not complain of any pain at the scene of the accident. In keeping

with the fact that BB was not seriously injured in the accident, BB did not visit any hospital emergency room following the accident. To the extent that BB experienced any health problems at all as a result of the accident, they were of low or minimal severity. On October 17, 2016, John purported to conduct an initial examination of BB at ATM Healthcare. To the extent that John performed the examination in the first instance, John did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, John did not consider any significant number of diagnoses or management options in connection with the examination. Instead, John, McClerren, and ATM Healthcare provided BB with substantially the same, phony, objectively unverifiable list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither BB's presenting problems, nor the treatment plan provided to BB by McClerren, John, and ATM Healthcare presented any risk of significant complications, morbidity, or mortality. To the contrary, BB did not need any significant treatment at all as a result of the accident, and the treatment plan provided by McClerren, ATM Healthcare, and John consisted of medically unnecessary chiropractic and physical therapy services, which did not pose a significant risk to BB. Even so, the Defendants billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that John engaged in some legitimate, low complexity medical decision-making during the purported examination.

(ii)    On January 3, 2017, an Insured named AN was involved in an automobile accident. The contemporaneous police report indicated that the airbags in AN's vehicle did not deploy. The police report further indicated that AN did not complain of any pain at the scene of the accident. In keeping with the fact that AN was not seriously injured in the accident, AN did not visit any hospital emergency room following the accident. To the extent that AN experienced any health problems at all as a result of the accident, they were of low or minimal severity. On January 5, 2017, Lowery purported to conduct an initial examination of AN at ATM Healthcare. To the extent that Lowery performed the examination in the first instance, Lowery did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Lowery did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Lowery, McClerren, and ATM Healthcare provided AN with substantially the same, phony, objectively unverifiable list of soft tissue injury "diagnoses" that they provided to virtually every other Insured.

Furthermore, neither AN's presenting problems, nor the treatment plan provided to AN by McClerren, Lowery, and ATM Healthcare presented any risk of significant complications, morbidity, or mortality. To the contrary, AN did not need any significant treatment at all as a result of the accident, and the treatment plan provided by McClerren, ATM Healthcare, and Lowery consisted of medically unnecessary chiropractic services, physical therapy services, and injections, which did not pose a significant risk to AN. Even so, the Defendants billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Lowery engaged in some legitimate, low complexity medical decision-making during the purported examination.

(iii)   On January 16, 2017, an Insured named KN was involved in an automobile accident. The contemporaneous police report indicated that the airbags in KN's vehicle did not deploy. The police report further indicated that KN did not complain of any pain at the scene of the accident. In keeping with the fact that KN was not seriously injured in the accident, KN did not visit any hospital emergency room following the accident. To the extent that KN experienced any health problems at all as a result of the accident, they were of low or minimal severity. On March 13, 2017, Lowery purported to conduct an initial examination of KN at ATM Healthcare. To the extent that Lowery performed the examination in the first instance, Lowery did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Lowery did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Lowery, McClerren, and ATM Healthcare provided KN with substantially the same, phony, objectively unverifiable list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither KN's presenting problems, nor the treatment plan provided to KN by McClerren, Lowery, and ATM Healthcare presented any risk of significant complications, morbidity, or mortality. To the contrary, KN did not need any significant treatment at all as a result of the accident, and the treatment plan provided by McClerren, ATM Healthcare, and Lowery consisted of medically unnecessary chiropractic services, physical therapy services, and trigger point injections, which did not pose a significant risk to KN. Even so, McClerren and ATM Healthcare billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Lowery engaged in some legitimate, low complexity medical decision-making during the purported examination. What is more, on March 16, 2017, Malcolm purported to conduct an initial examination of KN at ATM Healthcare.

To the extent that Malcolm performed the examination in the first instance, Malcolm did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Malcolm did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Malcolm, McClerren, and ATM Healthcare provided KN with substantially the same, phony, objectively unverifiable list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither KN's presenting problems, nor the treatment plan provided to KN by McClerren, Malcolm, and ATM Healthcare presented any risk of significant complications, morbidity, or mortality. To the contrary, KN did not need any significant treatment at all as a result of the accident, and the treatment plan provided by McClerren, ATM Healthcare, and Malcolm consisted of medically unnecessary chiropractic services, physical therapy services, and injections, which did not pose a significant risk to KN. Even so, the Defendants billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Malcolm engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(iv)    On June 23, 2017 an Insured named CC was involved in an automobile accident. The contemporaneous police report indicated that the airbags in CC's vehicle did not deploy and that CC's vehicle was drivable following the accident. The police report further indicated that CC did not complain of any pain at the scene of the accident. In keeping with the fact that CC was not seriously injured in the accident, CC did not visit any hospital emergency room following the accident. To the extent that CC experienced any health problems at all as a result of the accident, they were of low or minimal severity. On June 26, 2017, Herrild purported to conduct an initial examination of CC at ATM Healthcare. To the extent that Herrild performed the examination in the first instance, Herrild did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Herrild did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Herrild, McClerren, and ATM Healthcare provided CC with substantially the same, phony, objectively unverifiable list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither CC's presenting problems, nor the treatment plan provided to CC by McClerren, Herrild, and ATM Healthcare presented any risk of significant complications, morbidity, or mortality. To the contrary, CC did not need any significant treatment at

all as a result of the accident, and the treatment plan provided by McClerren, ATM Healthcare, and Herrild consisted of medically unnecessary chiropractic and physical therapy services, which did not pose a significant risk to CC. Even so, McClerren and ATM Healthcare billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Lowery engaged in some legitimate, moderate complexity medical decision-making during the purported examination. What is more, on June 28, 2017, Malcolm purported to conduct an initial examination of CC at ATM Healthcare. To the extent that Malcolm performed the examination in the first instance, Malcolm did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Malcolm did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Malcolm, McClerren, and ATM Healthcare provided CC with substantially the same, phony, objectively unverifiable list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither CC's presenting problems, nor the treatment plan provided to CC by McClerren, Malcolm, and ATM Healthcare presented any risk of significant complications, morbidity, or mortality. To the contrary, CC did not need any significant treatment at all as a result of the accident, and the treatment plan provided by McClerren, ATM Healthcare, and Malcolm consisted of medically unnecessary chiropractic services, physical therapy services, and injections, which did not pose a significant risk to CC. Even so, the Defendants billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Malcolm engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(v)     On June 29, 2017 an Insured named CD was involved in an automobile accident. The contemporaneous police report indicated that the airbags in CD's vehicle did not deploy and that CD's vehicle was drivable following the accident. The police report further indicated that CD did not complain of any pain at the scene of the accident. In keeping with the fact that CD was not seriously injured in the accident, CD did not visit any hospital emergency room following the accident. To the extent that CD experienced any health problems at all as a result of the accident, they were of low or minimal severity. On July 24, 2017, McClerren purported to conduct an initial examination of CD at ATM Healthcare. To the extent that McClerren performed the examination in the first instance, McClerren did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in

connection with the examination. Moreover, McClerren did not consider any significant number of diagnoses or management options in connection with the examination. Instead, McClerren and ATM Healthcare provided CD with substantially the same, phony, objectively unverifiable list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither CD's presenting problems, nor the treatment plan provided to CD by McClerren and ATM Healthcare presented any risk of significant complications, morbidity, or mortality. To the contrary, CD did not need any significant treatment at all as a result of the accident, and the treatment plan provided by McClerren and ATM Healthcare consisted of medically unnecessary chiropractic services, physical therapy services, and trigger point injections, which did not pose a significant risk to CD. Even so, McClerren and ATM Healthcare billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that McClerren engaged in some legitimate, low complexity medical decision-making during the purported examination. What is more, on July 27, 2017, Lee purported to conduct an initial examination of CD at ATM Healthcare. To the extent that Lee performed the examination in the first instance, Lee did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Lee did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Lee, McClerren, and ATM Healthcare provided CD with substantially the same, phony, objectively unverifiable list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither CD's presenting problems, nor the treatment plan provided to CD by Lee, McClerren, and ATM Healthcare presented any risk of significant complications, morbidity, or mortality. To the contrary, CD did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Lee, McClerren, and ATM Healthcare consisted of medically unnecessary chiropractic services, physical therapy services, and injections, which did not pose a significant risk to CD. Even so, the Defendants billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Lee engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(vi)   On July 18, 2017 an Insured named VC was involved in an automobile accident. The contemporaneous police report indicated that the airbags in VC's vehicle did not deploy and that VC's vehicle was drivable following the accident. The police report further indicated that VC did not complain of any pain at the scene of the accident. In keeping with the

fact that VC was not seriously injured in the accident, VC visited St Vincent's Hospital where she was briefly observed on an outpatient basis and was discharged with nothing more than cervical strain, thoracic strain, and shoulder pain diagnoses. To the extent that VC experienced any health problems at all as a result of the accident, they were of low or minimal severity. On July 20, 2017, Steelman purported to conduct an initial examination of VC at ATM Healthcare. To the extent that Steelman performed the examination in the first instance, Steelman did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Steelman did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Steelman, McClerren, and ATM Healthcare provided VC with substantially the same, phony, objectively unverifiable list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither VC's presenting problems, nor the treatment plan provided to VC by McClerren, Steelman, and ATM Healthcare presented any risk of significant complications, morbidity, or mortality. To the contrary, VC did not need any significant treatment at all as a result of the accident, and the treatment plan provided by McClerren, ATM Healthcare, and VC consisted of medically unnecessary chiropractic and physical therapy services, which did not pose a significant risk to VC. Even so, McClerren and ATM Healthcare billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Steelman engaged in some legitimate, low complexity medical decision-making during the purported examination. What is more, on July 25, 2017, Malcolm purported to conduct an initial examination of VC at ATM Healthcare. To the extent that Malcolm performed the examination in the first instance, Malcolm did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Malcolm did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Malcolm, McClerren, and ATM Healthcare provided VC with substantially the same, phony, objectively unverifiable list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither VC's presenting problems, nor the treatment plan provided to VC by McClerren, Malcolm, and ATM Healthcare presented any risk of significant complications, morbidity, or mortality. To the contrary, VC did not need any significant treatment at all as a result of the accident, and the treatment plan provided by McClerren, ATM Healthcare, and Malcolm consisted of medically unnecessary chiropractic services, physical therapy services, and

injections, which did not pose a significant risk to VC. Even so, the Defendants billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Malcolm engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(vii)   On September 22, 2017 an Insured named HH was involved in an automobile accident. The contemporaneous police report indicated that the airbags in HH's vehicle did not deploy and that HH's vehicle was drivable following the accident. The police report further indicated that HH did not complain of any pain at the scene of the accident. In keeping with the fact that HH was not seriously injured in the accident, HH did not visit any hospital emergency room following the accident. To the extent that HH experienced any health problems at all as a result of the accident, they were of low or minimal severity. On October 2, 2017, Lowery purported to conduct an initial examination of HH at ATM Healthcare. To the extent that Lowery performed the examination in the first instance, Lowery did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Lowery did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Lowery, McClerren, and ATM Healthcare provided HH with substantially the same, phony, objectively unverifiable list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither HH's presenting problems, nor the treatment plan provided to HH by McClerren, Lowery, and ATM Healthcare presented any risk of significant complications, morbidity, or mortality. To the contrary, HH did not need any significant treatment at all as a result of the accident, and the treatment plan provided by McClerren, ATM Healthcare, and Lowery consisted of medically unnecessary chiropractic and physical therapy services, which did not pose a significant risk to HH. Even so, McClerren and ATM Healthcare billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Lowery engaged in some legitimate, low complexity medical decision-making during the purported examination. What is more, on November 9, 2017, Lee purported to conduct an initial examination of HH at ATM Healthcare. To the extent that Lee performed the examination in the first instance, Lee did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Lee did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Lee, McClerren, and ATM Healthcare provided

HH with substantially the same, phony, objectively unverifiable list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither HH's presenting problems, nor the treatment plan provided to HH by McClerren, Lee, and ATM Healthcare presented any risk of significant complications, morbidity, or mortality. To the contrary, HH did not need any significant treatment at all as a result of the accident, and the treatment plan provided by McClerren, ATM Healthcare, and Lee consisted of medically unnecessary chiropractic services, physical therapy services, and injections, which did not pose a significant risk to HH. Even so, the Defendants billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Lee engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(viii)   On September 28, 2017 an Insured named TB was involved in an automobile accident. The contemporaneous police report indicated that the airbags in TB's vehicle did not deploy and that TB's vehicle was drivable following the accident. The police report further indicated that TB did not complain of any pain at the scene of the accident. In keeping with the fact that TB was not seriously injured in the accident, TB did not visit any hospital emergency room following the accident. To the extent that TB experienced any health problems at all as a result of the accident, they were of low or minimal severity. On October 5, 2017, Bloom purported to conduct an initial examination of TB at ATM Healthcare. To the extent that Bloom performed the examination in the first instance, Bloom did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Bloom did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Bloom, McClerren, and ATM Healthcare provided TB with substantially the same, phony, objectively unverifiable list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither TB's presenting problems, nor the treatment plan provided to TB by McClerren, Bloom, and ATM Healthcare presented any risk of significant complications, morbidity, or mortality. To the contrary, TB did not need any significant treatment at all as a result of the accident, and the treatment plan provided by McClerren, ATM Healthcare, and Bloom consisted of medically unnecessary chiropractic and physical therapy services, which did not pose a significant risk to TB. Even so, the Defendants Healthcare billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Bloom engaged in some legitimate, low complexity medical decision-making during the purported examination.

(ix)   On October 4, 2017 an Insured named AH was involved in an automobile accident. The contemporaneous police report indicated that the airbags in AH's vehicle did not deploy and that AH's vehicle was drivable following the accident. The police report further indicated that AH did not complain of any pain at the scene of the accident. In keeping with the fact that AH was not seriously injured in the accident, AH visited University of Florida Hospital a day after the accident, where he was briefly observed on an outpatient basis and discharged with nothing more serious than a contusion of his scalp. To the extent that AH experienced any health problems at all as a result of the accident, they were of low or minimal severity. On October 16, 2017, Bloom purported to conduct an initial examination of AH at ATM Healthcare. To the extent that Bloom performed the examination in the first instance, Bloom did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Bloom did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Bloom, McClerren, and ATM Healthcare provided AH with substantially the same, phony, objectively unverifiable list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither AH's presenting problems, nor the treatment plan provided to AH by McClerren, Bloom, and ATM Healthcare presented any risk of significant complications, morbidity, or mortality. To the contrary, AH did not need any significant treatment at all as a result of the accident, and the treatment plan provided by McClerren, ATM Healthcare, and Bloom consisted of medically unnecessary chiropractic and physical therapy services, which did not pose a significant risk to AH. Even so, McClerren and ATM Healthcare billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Bloom engaged in some legitimate, low complexity medical decision-making during the purported examination. What is more, on October 17, 2017, Malcolm purported to conduct an initial examination of AH at ATM Healthcare. To the extent that Malcolm performed the examination in the first instance, Malcolm did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Malcolm did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Malcolm, McClerren, and ATM Healthcare provided AH with substantially the same, phony, objectively unverifiable list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither AH's presenting problems, nor the

treatment plan provided to AH by McClerren, Malcolm, and ATM Healthcare presented any risk of significant complications, morbidity, or mortality. To the contrary, AH did not need any significant treatment at all as a result of the accident, and the treatment plan provided by McClerren, ATM Healthcare, and Malcolm consisted of medically unnecessary chiropractic services, physical therapy services, and injections, which did not pose a significant risk to AH. Even so, the Defendants billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Malcolm engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(x)     On November 7, 2018 an Insured named YY was involved in an automobile accident. The contemporaneous police report indicated that the airbags in YY's vehicle did not deploy and that YY's vehicle was drivable following the accident. The police report further indicated that YY did not complain of any pain at the scene of the accident. In keeping with the fact that YY was not seriously injured in the accident, YY did not visit any hospital emergency room following the accident. To the extent that YY experienced any health problems at all as a result of the accident, they were of low or minimal severity. On November 8, 2018, Lowery purported to conduct an initial examination of YY at ATM Healthcare. To the extent that Lowery performed the examination in the first instance, Lowery did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Lowery did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Lowery, McClerren, and ATM Healthcare provided YY with substantially the same, phony, objectively unverifiable list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither YY's presenting problems, nor the treatment plan provided to YY by McClerren, Lowery, and ATM Healthcare presented any risk of significant complications, morbidity, or mortality. To the contrary, YY did not need any significant treatment at all as a result of the accident, and the treatment plan provided by McClerren, ATM Healthcare, and Lowery consisted of medically unnecessary chiropractic and physical therapy services, which did not pose a significant risk to YY. Even so, McClerren and ATM Healthcare billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Lowery engaged in some legitimate, low complexity medical decision-making during the purported examination. What is more, on November 8, 2018, Lee purported to conduct an initial examination of YY at ATM

Healthcare. To the extent that Lee performed the examination in the first instance, Lee did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Lee did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Lee, McClerren, and ATM Healthcare provided YY with substantially the same, phony, objectively unverifiable list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither YY's presenting problems, nor the treatment plan provided to YY by McClerren, Lee, and ATM Healthcare presented any risk of significant complications, morbidity, or mortality. To the contrary, YY did not need any significant treatment at all as a result of the accident, and the treatment plan provided by McClerren, ATM Healthcare, and Lee consisted of medically unnecessary chiropractic services, physical therapy services, and injections, which did not pose a significant risk to YY. Even so, the Defendants billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Lee engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xi) On December 11, 2018 an Insured named IE was involved in an automobile accident. The contemporaneous police report indicated that the airbags in IE's vehicle did not deploy and that IE's vehicle was drivable following the accident. The police report further indicated that IE did not complain of any pain at the scene of the accident. In keeping with the fact that IE was not seriously injured in the accident, IE did not visit any hospital emergency room following the accident. To the extent that IE experienced any health problems at all as a result of the accident, they were of low or minimal severity. On December 18, 2018, Lowery purported to conduct an initial examination of IE at ATM Healthcare. To the extent that Lowery performed the examination in the first instance, Lowery did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Lowery did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Lowery, McClerren, and ATM Healthcare provided IE with substantially the same, phony, objectively unverifiable list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither IE's presenting problems, nor the treatment plan provided to IE by McClerren, Lowery, and ATM Healthcare presented any risk of significant complications, morbidity, or mortality. To the contrary, IE did not need any significant treatment at all as a result of the accident,

and the treatment plan provided by McClerren, ATM Healthcare, and Lowery consisted of medically unnecessary chiropractic and physical therapy services, which did not pose a significant risk to IE. Even so, the Defendants billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Lowery engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xii)   On May 4, 2019, an Insured named RS was involved in an automobile accident. The contemporaneous police report indicated that the airbags in RS's vehicle did not deploy and that RS's vehicle was drivable following the accident. The police report further indicated that RS did not complain of any pain at the scene of the accident. In keeping with the fact that RS was not seriously injured in the accident, RS did not visit any hospital emergency room following the accident. To the extent that RS experienced any health problems at all as a result of the accident, they were of low or minimal severity. On May 21, 2019, Malcolm purported to conduct an initial examination of RS at ATM Healthcare. To the extent that Malcolm performed the examination in the first instance, Malcolm did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Malcolm did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Malcolm, McClerren, and ATM Healthcare provided RS with substantially the same, phony, objectively unverifiable list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither RS's presenting problems, nor the treatment plan provided to RS by McClerren, Malcolm, and ATM Healthcare presented any risk of significant complications, morbidity, or mortality. To the contrary, RS did not need any significant treatment at all as a result of the accident, and the treatment plan provided by McClerren, ATM Healthcare, and Malcolm consisted of medically unnecessary chiropractic services, physical therapy services, and injections, which did not pose a significant risk to RS. Even so, the Defendants billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Malcolm engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xiii)   On August 13, 2019, an Insured named LM was involved in an automobile accident. The contemporaneous police report indicated that the airbags in LM's vehicle did not deploy and that LM's vehicle was drivable following the accident. The police report further indicated that

LM did not complain of any pain at the scene of the accident. In keeping with the fact that LM was not seriously injured in the accident, LM did not visit any hospital emergency room following the accident. To the extent that LM experienced any health problems at all as a result of the accident, they were of low or minimal severity. On August 27, 2019, Mead purported to conduct an initial examination of LM at ATM Healthcare. To the extent that Mead performed the examination in the first instance, Mead did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Mead did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Mead, McClerren, and ATM Healthcare provided LM with substantially the same, phony, objectively unverifiable list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither LM's presenting problems, nor the treatment plan provided to LM by McClerren, Mead, and ATM Healthcare presented any risk of significant complications, morbidity, or mortality. To the contrary, LM did not need any significant treatment at all as a result of the accident, and the treatment plan provided by McClerren, ATM Healthcare, and Mead consisted of medically unnecessary chiropractic and physical therapy services, which did not pose a significant risk to LM. Even so, the Defendants billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Mead engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xiv)   On March 3, 2020 an Insured named WN was involved in an automobile accident. The contemporaneous police report indicated that the airbags in WN's vehicle did not deploy and that WN's vehicle was drivable following the accident. The police report further indicated that WN did not complain of any pain at the scene of the accident. In keeping with the fact that WN was not seriously injured in the accident, WN did not visit any hospital emergency room following the accident. To the extent that WN experienced any health problems at all as a result of the accident, they were of low or minimal severity. On March 6, 2020, Francis purported to conduct an initial examination of WN at ATM Healthcare. To the extent that Francis performed the examination in the first instance, Francis did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Francis did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Francis, McClerren, and ATM Healthcare provided WN with substantially the same, phony,

objectively unverifiable list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither WN's presenting problems, nor the treatment plan provided to WN by McClerren, Francis, and ATM Healthcare presented any risk of significant complications, morbidity, or mortality. To the contrary, WN did not need any significant treatment at all as a result of the accident, and the treatment plan provided by McClerren, ATM Healthcare, and Francis consisted of medically unnecessary chiropractic and physical therapy services, which did not pose a significant risk to WN. Even so, the Defendants billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Francis engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xv)   On August 6, 2020 an Insured named SP was involved in an automobile accident. The contemporaneous police report indicated that the airbags in SP's vehicle did not deploy and that SP's vehicle was drivable following the accident. The police report further indicated that SP did not complain of any pain at the scene of the accident. In keeping with the fact that SP was not seriously injured in the accident, SP did not visit any hospital emergency room following the accident. To the extent that SP experienced any health problems at all as a result of the accident, they were of low or minimal severity. On August 12, 2020, Mead purported to conduct an initial examination of SP at ATM Healthcare. To the extent that Mead performed the examination in the first instance, Mead did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Mead did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Mead, McClerren, and ATM Healthcare provided SP with substantially the same, phony, objectively unverifiable list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither SP's presenting problems, nor the treatment plan provided to SP by McClerren, Mead, and ATM Healthcare presented any risk of significant complications, morbidity, or mortality. To the contrary, SP did not need any significant treatment at all as a result of the accident, and the treatment plan provided by McClerren, ATM Healthcare, and Mead consisted of medically unnecessary chiropractic and physical therapy services, which did not pose a significant risk to SP. Even so, the Defendants billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Mead engaged in some legitimate, low complexity medical decision-making during the purported examination.

153.   These are only representative examples. In the claims identified in Exhibit "1", the Defendants routinely falsely represented that the purported examinations involved legitimate low- or moderate-complexity decision-making, when in fact they did not involve any legitimate medical decision-making.

154.   In a legitimate clinical setting, when a patient presents with a soft tissue injury such as a sprain or strain arising from an automobile accident, the initial standard of care is conservative treatment comprised of rest, ice, compression, and – if applicable – elevation of the affected body part.

155.   It generally is inappropriate to begin administering physical therapy to a patient with a soft tissue injury in the immediate aftermath of the injury, before the patient has first tried a more conservative course of rest, ice, compression, and – if applicable – elevation of the affected body part.

156.   Even so, in the claims identified in Exhibit "1", the Defendants routinely directed Insureds to immediately begin a course of physical therapy often within days of their accidents, or even on the same day of their accident, before the Insureds had first tried a more conservative course of treatment.

157.   The Defendants routinely directed Insureds to immediately begin a course of physical therapy often within days of their accidents, or even on the same day of their accidents, because their putative initial examinations involved no legitimate medical decision-making whatsoever, and had pre-determined outcomes.

158.   What is more, there are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

159.   An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

160.   As set forth above, in the claims identified in Exhibit "1", most of the Insureds who purportedly received treatment at ATM Healthcare were involved in relatively minor accidents.

161.   It is improbable that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibit "1" would suffer substantially identical injuries as the result of their accidents, or require a substantially identical course of treatment.

162.   It likewise is improbable that two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibit "1" would present for an initial examination with substantially identical symptoms, and receive substantially identical diagnoses, on or about the <u>exact same date</u> after their underlying automobile accident, in some cases weeks or months after the accident.

163.   It is even more improbable – to the point of impossibility – that this would occur with great frequency within a cohort of patients treating at a single health care practice such as ATM Healthcare.

164. Even so, in keeping with the fact that their putative "diagnoses" were phony, and in keeping with the fact that their putative initial examinations involved no actual medical decision-making at all, the Defendants – or the ATM Chiropractors, ATM Physicians, and ATM Nurses working at the direction of the Defendants – frequently issued substantially identical, phony "diagnoses", on or around the same date, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds.

165. For example:

(i) On May 31, 2017, two Insureds – AM and KN – were involved in the same automobile accident. Thereafter – incredibly – AM and KN presented at ATM Healthcare for initial examinations by Herrild on the exact same date, June 30, 2017. AM and KN were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that AM and KN suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Defendants provided AM and KN with substantially identical, false soft tissue injury "diagnoses".

(ii) On June 28, 2017, two Insureds – CA and RR – were involved in the same automobile accident. Thereafter – incredibly – CA and RR presented at ATM Healthcare for initial examinations by Lowery on the exact same date, July 5, 2017. CA and RR were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that CA and RR suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Defendants provided CA and RR with substantially identical, false soft tissue injury "diagnoses".

(iii) On June 29, 2017, two Insureds – CD and CD – were involved in the same automobile accident. Thereafter – incredibly – CD and CD presented at ATM Healthcare for initial examinations by McClerren on the exact same date, July 24, 2017. CD and CD were different ages, in different physical conditions, located in different positions in the vehicle,

and experienced the impact from different positions in the vehicle. To the extent that CD and CD suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Defendants provided CD and CD with substantially identical, false soft tissue injury "diagnoses".

(iv)     On September 4, 2017, two Insureds – CF and TG – were involved in the same automobile accident. Thereafter – incredibly – CF and TG presented at ATM Healthcare for initial examinations by Lowery on the exact same date, September 18, 2017. CF and TG were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that CF and TG suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Defendants provided CF and TG with substantially identical, false soft tissue injury "diagnoses".

(v)     On September 6, 2017, two Insureds – BV and SV – were involved in the same automobile accident. Thereafter – incredibly – BV and SV presented at ATM Healthcare for initial examinations by Herrild on the exact same date, September 15, 2017. BV and SV were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that BV and SV suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Defendants provided BV and SV with substantially identical, false soft tissue injury "diagnoses".

(vi)     On March 9, 2018, two Insureds – KP and AK – were involved in the same automobile accident. Thereafter – incredibly – KP and AK presented at ATM Healthcare for initial examinations by Lowery on the exact same date, March 19, 2018. KP and AK were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that KP and AK suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Defendants provided KP and AK with substantially identical, false soft tissue injury "diagnoses".

(vii)     On March 31, 2018, two Insureds – KC and TV – were involved in the same automobile accident. Thereafter – incredibly – KC and TV presented at ATM Healthcare for initial examinations by Francis on the exact same date, April 3, 2018. KC and TV were different ages, in

different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that KC and TV suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Defendants provided KC and TV with substantially identical, false soft tissue injury "diagnoses".

(viii)   On May 26, 2018, two Insureds – LS and SS – were involved in the same automobile accident. Thereafter – incredibly – LS and SS presented at ATM Healthcare for initial examinations by McClerren on the exact same date, May 29, 2018. LS and SS were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that LS and SS suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Defendants provided LS and SS with substantially identical, false soft tissue injury "diagnoses".

(ix)    On September 17, 2018, two Insureds – VC and MC – were involved in the same automobile accident. Thereafter – incredibly – VC and MC presented at ATM Healthcare for initial examinations by McClerren on the exact same date, September 25, 2018. VC and MC were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that VC and MC suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Defendants provided VC and MC with substantially identical, false soft tissue injury "diagnoses".

(x)     On October 8, 2018, two Insureds – SG and AJ – were involved in the same automobile accident. Thereafter – incredibly – SG and AJ presented at ATM Healthcare for initial examinations by Lowery on the exact same date, October 9, 2018. SG and AJ were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that SG and AJ suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Defendants provided SG and AJ with substantially identical, false soft tissue injury "diagnoses".

(xi)    On November 3, 2018, two Insureds – DO and WO – were involved in the same automobile accident. Thereafter – incredibly – DO and WO presented at ATM Healthcare for initial examinations by Steelman on

the exact same date, November 5, 2018. DO and WO were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that DO and WO suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Defendants provided DO and WO with substantially identical, false soft tissue injury "diagnoses".

(xii)   On February 8, 2019, two Insureds – RK and RK – were involved in the same automobile accident. Thereafter – incredibly – RK and RK presented at ATM Healthcare for initial examinations by Francis on the exact same date, February 15, 2019. RK and RK were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that RK and RK suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Defendants provided RK and RK with substantially identical, false soft tissue injury "diagnoses".

(xiii)  On September 6, 2020, two Insureds – DB and JB – were involved in the same automobile accident. Thereafter – incredibly – DB and JB presented at ATM Healthcare for initial examinations by Mead on the exact same date, September 19, 2020. DB and JB were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that DB and JB suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Defendants provided DB and JB with substantially identical, false soft tissue injury "diagnoses".

(xiv)   On June 9, 2020, two Insureds – CB and DM – were involved in the same automobile accident. Thereafter – incredibly – CB and DM presented at ATM Healthcare for initial examinations by Mead on the exact same date, June 19, 2020. CB and DM were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that CB and DM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Defendants provided CB and DM with substantially identical, false soft tissue injury "diagnoses".

(xv)    On May 15, 2021, two Insureds – HW and MW – were involved in the same automobile accident. Thereafter – incredibly – HW and MW

presented at ATM Healthcare for initial examinations by Mendez on the exact same date, May 24, 2021. HW and MW were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that HW and MW suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Defendants provided HW and MW with substantially identical, false soft tissue injury "diagnoses".

(xvi)   On June 2, 2021, two Insureds – LE and SH – were involved in the same automobile accident. Thereafter – incredibly – LE and SH presented at ATM Healthcare for initial examinations by Mendez on the exact same date, June 9, 2021. LE and SH were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that LE and SH suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Defendants provided LE and SH with substantially identical, false soft tissue injury "diagnoses".

(xvii)  On December 22, 2021, two Insureds – VO and NS – were involved in the same automobile accident. Thereafter – incredibly – VO and NS presented at ATM Healthcare for initial examinations by Francis on the exact same date, December 23, 2021. VO and NS were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that VO and NS suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Defendants provided VO and NS with substantially identical, false soft tissue injury "diagnoses".

(xviii) On July 30, 2022, two Insureds – AG and SS – were involved in the same automobile accident. Thereafter – incredibly – AG and SS presented at ATM Healthcare for initial examinations by Francis on the exact same date, August 16, 2022. AG and SS were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that AG and SS suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Defendants provided AG and SS with substantially identical, false soft tissue injury "diagnoses".

(xix)   On September 8, 2022, two Insureds – JN and RN – were involved in the

same automobile accident. Thereafter – incredibly – JN and RN presented at ATM Healthcare for initial examinations by Lowery on the exact same date, September 13, 2022. JN and RN were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that JN and RN suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Defendants provided JN and RN with substantially identical, false soft tissue injury "diagnoses".

(xx)  On October 12, 2022, two Insureds – AB and AJ – were involved in the same automobile accident. Thereafter – incredibly – AB and AJ presented at ATM Healthcare for initial examinations by Mead on the exact same date, October 12, 2022. AB and AJ were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that AB and AJ suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Defendants provided AB and AJ with substantially identical, false soft tissue injury "diagnoses".

166.  These are only representative examples. In the claims for initial examinations that are identified in Exhibit "1" McClerren and ATM Healthcare routinely inserted false "diagnoses" in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, and in order to create a false justification for the other Fraudulent Services that they purported to provide to the Insureds, including medically unnecessary follow-up examinations, physical therapy, chiropractic, nerve conduction velocity testing, shockwave therapy, and pain management services.

167.  To the extent that the Insureds in the claims identified in Exhibit "1" ever had any genuine medical problems at all as the result of their minor automobile

accidents, the problems virtually always were limited to ordinary sprains or strains of the back, neck, or extremities.

168.   The diagnosis and treatment of these ordinary sprains and strains did not require any "low complexity" or "moderate complexity" medical decision-making on the part of the Defendants, the ATM Chiropractors, the ATM Physicians, the ATM Nurses, or any other health care providers associated with ATM Healthcare.

169.   To the contrary, the initial examinations did not involve any legitimate medical decision-making at all, because the purported "results" of the examinations were pre-determined, falsified, and designed to provide a false justification for the laundry-list of other Fraudulent Services that the Defendants purported to provide.

170.   In the claims for initial examinations identified in Exhibit "1", the Defendants routinely falsely represented that the initial examinations involved medical decision-making of low or moderate complexity in order to provide a false basis to bill for the initial examinations under CPT codes 99203 and 99204, because CPT codes 99203 and 99204 are reimbursable at higher rates than examinations that do not require low or moderate complexity medical decision-making.

171.   In the claims for initial examinations identified in Exhibit "1", the Defendants routinely fraudulently misrepresented that the examinations were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

   (i)   the putative examinations were illusory, with outcomes that were pre-determined to result in substantially-identical, phony "diagnoses" and

treatment recommendations, regardless of the Insureds' true individual circumstances and presentation; and

(ii) the charges for the putative examinations misrepresented the nature, extent, and results of the examinations.

172.   In this context, McClerren – who at all relevant times purported to be the sole owner of ATM Healthcare – did not, and could not have, legitimately supervised the business activities of ATM Healthcare.

173.   Had McClerren actually supervised the business activities of ATM Healthcare, McClerren would have noted – among other things – that ATM Healthcare's billing falsely represented that the purported initial examinations were legitimately and lawfully performed.

**(ii)    The Fraudulent Charges for Follow-Up Examinations at ATM Healthcare**

174.   In addition to their fraudulent initial examinations, the Defendants also purported to subject many of the Insureds in the claims identified in Exhibit "1" to one or more fraudulent follow-up examinations during the course of their fraudulent treatment protocol.

175.   In the claims identified in Exhibit "1", McClerren, the ATM Physicians, the ATM Chiropractors, and the ATM Nurses purported to personally perform the vast majority of the follow-up examinations on behalf  in the claims identified in Exhibit "1".

176.   As set forth in Exhibit "1", the Defendants then billed many of the follow-up examinations to GEICO under CPT code 99213, typically resulting in

charges between $158.34 and $239.60 for each follow-up examination they purported to provide.

177.    As set forth in Exhibit "1", the Defendants also billed many of the follow-up examinations to GEICO under CPT code 99214, typically resulting in charges between $267.23 and $308.05 for each follow up examination they purported to provide.

178.    In the claims for follow-up examinations identified in Exhibit "1", the charges for the follow-up examinations were fraudulent in that they misrepresented the Defendants' eligibility to collect PIP Benefits in the first instance.

179.    As set forth below, the Defendants' charges for the follow-up examinations identified in Exhibit "1" also were fraudulent in that they misrepresented the nature, extent, and results of the examinations.

**a.    Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

180.    As set forth above, to the limited extent that the Insureds in the claims identified in Exhibit "1" suffered any injuries at all in their relatively minor automobile accident, the injuries were minor soft tissue injuries such as sprains, strains, or similar soft tissue injuries, which were not severe at all.

181.    These injuries – to the extent that they existed in the first instance – were of low or minimal severity at the outset, and were of minimal severity by the time the Insureds presented for the purported follow-up examinations, typically weeks or even months after the underlying accidents.

182.   Even so, in the claims for follow-up examinations identified in Exhibit "1", the Defendants routinely billed for their putative follow-up examinations under CPT codes 99213 and 99214, and thereby falsely represented that the Insureds continued to suffer from presenting problems of low to moderate severity and moderate to high severity at the time of the purported follow-up examinations.

183.   For example:

(i)      On January 3, 2017, an Insured named AN was involved in an automobile accident. The contemporaneous police report indicated that the airbags in AN's vehicle did not deploy. The police report further indicated that AN did not complain of any pain at the scene of the accident. In keeping with the fact that AN was not seriously injured in the accident, AN did not visit any hospital emergency room following the accident. To the extent that AN experienced any health problems at all as a result of the accident, they were of low or minimal severity and either resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of AN by Lee on July 26, 2017 – six months after the accident – McClerren, Lee, and ATM Healthcare billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that AN presented with problems of moderate to high severity at the follow-up examination.

(ii)     On June 23, 2017 an Insured named CC was involved in an automobile accident. The contemporaneous police report indicated that the airbags in CC's vehicle did not deploy and that CC's vehicle was drivable following the accident. The police report further indicated that CC did not complain of any pain at the scene of the accident. In keeping with the fact that CC was not seriously injured in the accident, CC did not visit any hospital emergency room following the accident. To the extent that CC experienced any health problems at all as a result of the accident, they were of low or minimal severity and either resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of CC by Herrild on August 30, 2017 – two months after the accident – McClerren, Herrild, and ATM Healthcare billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that CC presented with problems of moderate to high severity at the follow-up examination.

(iii)     On July 18, 2017 an Insured named VC was involved in an automobile accident. The contemporaneous police report indicated that the airbags in VC's vehicle did not deploy and that VC's vehicle was drivable following the accident. The police report further indicated that VC did not complain of any pain at the scene of the accident. In keeping with the fact that VC was not seriously injured in the accident, VC visited St Vincent's Hospital where she was briefly observed on an outpatient basis and was discharged with nothing more than cervical strain, thoracic strain, and shoulder pain diagnoses. To the extent that VC experienced any health problems at all as a result of the accident, they were of low or minimal severity and either resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of VC by Lee on August 8, 2017, McClerren, Lee, and ATM Healthcare billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that VC presented with problems of moderate to high severity at the follow-up examination.

(iv)     On October 4, 2017 an Insured named AH was involved in an automobile accident. The contemporaneous police report indicated that the airbags in AH's vehicle did not deploy and that AH's vehicle was drivable following the accident. The police report further indicated that AH did not complain of any pain at the scene of the accident. In keeping with the fact that AH was not seriously injured in the accident, AH visited University of Florida Hospital a day after the accident, where he was briefly observed on an outpatient basis and discharged with nothing more serious than a contusion of his scalp. To the extent that AH experienced any health problems at all as a result of the accident, they were of low or minimal severity and either resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of AH by Malcolm on February 22, 2018 – five months after the accident – McClerren, Malcolm, and ATM Healthcare billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that AH presented with problems of moderate to high severity at the follow-up examination.

(v)     On November 7, 2018 an Insured named YY was involved in an automobile accident. The contemporaneous police report indicated that the airbags in YY's vehicle did not deploy and that YY's vehicle was drivable following the accident. The police report further indicated that YY did not complain of any pain at the scene of the accident. In keeping with the fact that YY was not seriously injured in the accident, YY did not visit any hospital emergency room following the accident. To the extent that YY experienced any health problems at all as a result of the

accident, they were of low or minimal severity and either resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of YY by Malcolm on January 21, 2019 – two months after the accident – McClerren, Malcolm, and ATM Healthcare billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that YY presented with problems of low to moderate severity at the follow-up examination.

(vi)    On August 13, 2019, an Insured named LM was involved in an automobile accident. The contemporaneous police report indicated that the airbags in LM's vehicle did not deploy and that LM's vehicle was drivable following the accident. The police report further indicated that LM did not complain of any pain at the scene of the accident. In keeping with the fact that LM was not seriously injured in the accident, LM did not visit any hospital emergency room following the accident. To the extent that LM experienced any health problems at all as a result of the accident, they were of low or minimal severity and either resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of LM by Lee on October 23, 2019 – two months after the accident – McClerren, Lee, and ATM Healthcare billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that LM presented with problems of low to moderate severity at the follow-up examination.

(vii)   On January 15, 2020 an Insured named TS was involved in an automobile accident. The contemporaneous police report indicated that the airbags in TS's vehicle did not deploy and that TS's vehicle was drivable following the accident. The police report further indicated that TS did not complain of any pain at the scene of the accident. In keeping with the fact that TS was not seriously injured in the accident, TS did not visit any hospital emergency room following the accident. To the extent that TS experienced any health problems at all as a result of the accident, they were of low or minimal severity and either resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of TS by Malcolm on July 13, 2021 – eighteen months after the accident – McClerren, Malcolm, and ATM Healthcare billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that TS presented with problems of moderate to high severity at the follow-up examination.

(viii)  On August 6, 2020 an Insured named SP was involved in an automobile accident. The contemporaneous police report indicated that the airbags in SP's vehicle did not deploy and that SP's vehicle was drivable

following the accident. The police report further indicated that SP did not complain of any pain at the scene of the accident. In keeping with the fact that SP was not seriously injured in the accident, SP did not visit any hospital emergency room following the accident. To the extent that SP experienced any health problems at all as a result of the accident, they were of low or minimal severity and either resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of SP by Malcolm on October 9, 2020 – two months after the accident – McClerren, Malcolm, and ATM Healthcare billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that SP presented with problems of moderate to high severity at the follow-up examination.

(ix)     On February 9, 2022 an Insured named DB was involved in an automobile accident. The contemporaneous police report indicated that the airbags in DB's vehicle did not deploy and that DB's vehicle was drivable following the accident. The police report further indicated that DB did not complain of any pain at the scene of the accident. In keeping with the fact that DB was not seriously injured in the accident, DB did not visit any hospital emergency room following the accident. To the extent that DB experienced any health problems at all as a result of the accident, they were of low or minimal severity and either resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of DB by Rhoades on May 5, 2022 – three months after the accident – McClerren, Rhoades, and ATM Healthcare billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that DB presented with problems of moderate to high severity at the follow-up examination.

(x)     On September 1, 2022 an Insured named MM was involved in an automobile accident. The contemporaneous police report indicated that the airbags in MM's vehicle did not deploy and that MM's vehicle was drivable following the accident. The police report further indicated that MM did not complain of any pain at the scene of the accident. In keeping with the fact that MM was not seriously injured in the accident, MM did not visit any hospital emergency room following the accident. To the extent that MM experienced any health problems at all as a result of the accident, they were of low or minimal severity and either resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of MM by Rhoades on November 16, 2022 – three months after the accident – McClerren, Rhoades, and ATM Healthcare billed GEICO for the follow-up examination using CPT code

99214, and thereby falsely represented that MM presented with problems of moderate to high severity at the follow-up examination.

184. These are only representative examples. In the claims for follow-up examinations identified in Exhibit "1", the Defendants routinely falsely represented that the Insureds presented with problems of low to moderate or moderate to high severity, when in fact the Insureds either did not have any genuine presenting problems at all as the result of their relatively minor automobile accidents at the time of the follow-up examinations, or else their presenting problems were minimal.

185. In the claims for follow-up examinations identified in Exhibit "1", the Defendants routinely falsely represented that the Insureds presented with problems of low to moderate severity and moderate to high severity in order to create a false basis for their charges for the examinations under CPT codes 99213 and 99214 because follow-up examinations billable under CPT codes 99213 and 99214 are reimbursable at higher rates than examinations involving presenting problems of minimal severity, or no severity.

186. In the claims for follow-up examinations identified in Exhibit "1", the Defendants also routinely falsely represented that the Insureds presented with problems of low to moderate severity and moderate to high severity in order to create a false basis for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

**b.    Misrepresentations Regarding the Results of the Follow-Up Examinations**

187.    Pursuant to the CPT Assistant, when the Defendants billed for their putative follow up examinations under CPT codes 99213 and 99214, they represented that the physicians, nurses, or chiropractors who performed the examinations – virtually always McClerren, one of the ATM Physicians, one of the ATM Chiropractors, or one of the ATM Nurses – performed at least two of the following three components: (i) took legitimate patient histories; (ii) conducted legitimate physical examinations; and (iii) engaged in legitimate medical decision-making.

188.    In actuality, however, the physicians, chiropractors, and nurses who performed the examinations did not take any legitimate patient histories, conduct any legitimate physical examinations, or engage in any legitimate medical decision-making at all.

189.    Rather, following their purported follow-up examinations, McClerren, or the ATM Physicians, ATM Nurses, and ATM Chiropractors, at McClerren's direction, simply: (i) reiterated the false soft tissue injury "diagnoses" from the Insureds' initial examinations or previous follow-up examinations; and recommended: (ii) interventional pain management services; and (iii) that the Insureds return for additional follow-up examinations; or (iv) discharged the Insureds from "treatment", to the extent that their PIP Benefits had been exhausted.

190.    In the claims for initial examinations identified in Exhibit "1", the Defendants routinely fraudulently misrepresented that the follow-up examinations

were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the putative follow-up examinations were illusory, with outcomes that were pre-determined to result in substantially-identical, false "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)    the charges for the putative follow-up examinations misrepresented the nature and extent of the examinations; and

(iii)   Defendants never were eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as they operated in pervasive violation of Florida law.

191.   In this context, McClerren – who at all relevant times purported to be the sole owner of ATM Healthcare – did not, and could not have, legitimately supervised the business activities of ATM Healthcare.

192.   Had McClerren actually supervised the business activities of ATM Healthcare, McClerren would have noted – among other things – that ATM Healthcare's billing falsely represented that the putative follow-up examinations were legitimately and lawfully performed.

## 3.   The Fraudulent Charges for Chiropractic and Physical Therapy Services at ATM Healthcare

193.   In addition to the fraudulent initial examinations and follow-up examinations, the Defendants almost always purported to subject each of the Insureds in the claims identified in Exhibit "1" to months of medically unnecessary chiropractic and physical therapy services.

194.    As set forth in Exhibit "1", the Defendants then billed the purported chiropractic and physical therapy services to GEICO under:

(i)     CPT code 97010, for putative hot/cold pack application, typically resulting in charges ranging from $10.00 to $40.00 for each round of hot/cold pack therapy they purported to provide;

(ii)    CPT code 97012, for putative mechanical traction therapy, typically resulting in charges ranging from $35.12 to $57.40 for each round of mechanical traction they purported to provide;

(iii)   CPT code 97035, for putative ultrasound, typically resulting in charges ranging from $33.35 to $57.04 for each round of ultrasound they purported to provide;

(iv)    CPT code 97110, for putative therapeutic exercises, typically resulting in charges ranging from $64.36 to $162.74 for each round of therapeutic exercises they purported to provide;

(v)     CPT code 97140, for putative manual therapy, typically resulting in a charges ranging from $68.95 to $74.95 for each round of manual therapy they purported to provide;

(vi)    CPT codes 98940, 98941, and/or 98943 for putative chiropractic manipulative treatment, typically resulting in charges of between $70.00 and $94.27 for each round of chiropractic manipulative treatment they purported to provide; and/or

(vii)   Health Care Common Procedure Coding System ("HCCPCS") code G0283 for putative electric stimulation treatments, resulting in charges ranging from $34.50 to $49.00 for each round of electrical stimulation they purported to provide.

195.    In the claims for chiropractic and physical therapy services identified in Exhibit "1" the charges for the chiropractic and physical therapy services were fraudulent in that they misrepresented Defendants' eligibility to collect PIP Benefits in the first instance.

196.    In fact, and as set forth above, the Defendants never were eligible to collect PIP Benefits, because of their fraudulent and unlawful activities.

197.    Furthermore, the purported physical therapy services that were billed through ATM Healthcare to GEICO were unlawfully performed by Castaneda, Booth, Pinero, Porro, Ferguson, and other massage therapists and unlicensed individuals.

198.    What is more, in a legitimate clinical setting, the individual physical therapy services that are provided to an individual patient should be tailored to that patient's individual circumstances and presentation.

199.    In keeping with the fact that the purported chiropractic and physical therapy services that were billed through ATM Healthcare to GEICO were not medically necessary, the Defendants did not tailor the chiropractic and physical therapy services they purported to provide to each Insured's individual circumstances and presentation.

200.    There are a large number of individual types of physical therapy services that potentially can be provided to a patient, depending on the patient's individual symptomatology and needs.

201.    However, the Defendants routinely purported to provide the same handful of chiropractic and physical therapy "treatments" to virtually every Insured in the claims identified in Exhibit "1", on substantially the same schedule, without regard for the Insureds' individual circumstances.

202.   Specifically, ATM Healthcare, McClerren, and the ATM Chiropractors purported to provide virtually every Insured in the claims identified in Exhibit "1" with two-to-three months of chiropractic and physical therapy services, consisting of chiropractic adjustments, hot/cold pack application, mechanical traction, ultrasound, neuromuscular reeducation, manual therapy, therapeutic activities, and electric stimulation. This, despite the fact that the Insureds were differently situated, and could not possibly all have required a substantially identical course of physical therapy treatment.

**4.     The Fraudulent Charges for "Extracorporeal Shockwave Therapy" at ATM Healthcare**

203.   Based upon the false, boilerplate "diagnoses" that the Defendants provided during the initial and follow-up examinations, the Defendants also purported to subject many of the Insureds in the claims identified in Exhibit "1" to one or more sessions of ESWT during the course of their fraudulent treatment protocol.

204.   Typically, McClerren and the ATM Chiropractors purported to perform the ESWT at ATM Healthcare, which then was billed through ATM Healthcare to GEICO under CPT code 0101T, typically resulting in charges between $345.13 and $1,252.56 for each round of ESWT that supposedly was provided.

205.   Like the charges for the other Fraudulent Services, the charges for ESWT were fraudulent in that the ESWT was medically unnecessary and was provided – to the extent that it was provided at all – pursuant to the false, boilerplate "diagnoses" that the Defendants provided during their fraudulent examinations.

206.   In keeping with the fact that the Defendants' ESWT "treatments" were medically unnecessary, ESWT has not been approved by the US Food and Drug Administration ("FDA") for the treatment of back, neck, or shoulder pain, the Centers for Medicare & Medicaid Services ("CMS") has published coverage guidance stating that ESWT is not reasonable and necessary for the treatment of musculoskeletal conditions, and there are no legitimate peer reviewed data that establish the effectiveness of ESWT for the treatment of back, neck, or shoulder pain.

207.   Even so, the Defendants purported to provide medically unnecessary ESWT to hundreds of Insureds pursuant to their pre-determined fraudulent treatment protocol without regard to each Insured's individual complaints, symptoms, or presentation. For example:

(i)     On or about July 9, 2021, ATM Healthcare and McClerren billed Plaintiffs for medically unnecessary ESWT they purported to provide to an Insured named SB.

(ii)    On or about September 24, 2021, ATM Healthcare and McClerren billed Plaintiffs for medically unnecessary ESWT they purported to provide to an Insured named AD.

(iii)   On or about October 22, 2021, ATM Healthcare and McClerren billed Plaintiffs for medically unnecessary ESWT they purported to provide to an Insured named FB.

(iv)    On or about November 9, 2021, ATM Healthcare and McClerren billed Plaintiffs for medically unnecessary ESWT they purported to provide to an Insured named DH.

(v)     On or about December 7, 2021, ATM Healthcare and McClerren billed Plaintiffs for medically unnecessary ESWT they purported to provide to an Insured named CC.

(vi)    On or about December 9, 2021, ATM Healthcare and McClerren billed

Plaintiffs for medically unnecessary ESWT they purported to provide to an Insured named BD.

(vii)    On or about March 25, 2022, ATM Healthcare and McClerren billed Plaintiffs for medically unnecessary ESWT they purported to provide to an Insured named KB.

(viii)    On or about April 20, 2022, ATM Healthcare and McClerren billed Plaintiffs for medically unnecessary ESWT they purported to provide to an Insured named BM.

(ix)    On or about May 20, 2022, ATM Healthcare and McClerren billed Plaintiffs for medically unnecessary ESWT they purported to provide to an Insured named Teresa Daniel.

(x)    On or about July 1, 2022, ATM Healthcare and McClerren billed Plaintiffs for medically unnecessary ESWT they purported to provide to an Insured named DC.

(xi)    On or about July 12, 2022, ATM Healthcare and McClerren billed Plaintiffs for medically unnecessary ESWT they purported to provide to an Insured named MT.

(xii)    On or about August 9, 2022, ATM Healthcare and McClerren billed Plaintiffs for medically unnecessary ESWT they purported to provide to an Insured named MB.

(xiii)    On or about August 26, 2022, ATM Healthcare and McClerren billed Plaintiffs for medically unnecessary ESWT they purported to provide to an Insured named SA.

(xiv)    On or about August 31, 2022, ATM Healthcare and McClerren billed Plaintiffs for medically unnecessary ESWT they purported to provide to an Insured named RC.

(xv)    On or about September 12, 2022, ATM Healthcare and McClerren billed Plaintiffs for medically unnecessary ESWT they purported to provide to an Insured named SS.

(xvi)    On or about October 21, 2022, ATM Healthcare and McClerren billed Plaintiffs for medically unnecessary ESWT they purported to provide to an Insured named DS.

(xvii)   On or about December 21, 2022, ATM Healthcare and McClerren billed Plaintiffs for medically unnecessary ESWT they purported to provide to an Insured named MC.

(xviii)  On or about January 20, 2023, ATM Healthcare and McClerren billed Plaintiffs for medically unnecessary ESWT they purported to provide to an Insured named SB.

(xix)    On or about February 1, 2023, ATM Healthcare and McClerren billed Plaintiffs for medically unnecessary ESWT they purported to provide to an Insured named MD.

(xx)     On or about April 7, 2023, ATM Healthcare and McClerren billed Plaintiffs for medically unnecessary ESWT they purported to provide to an Insured named EC.

208.   These are only representative examples. In the claims for ESWT identified in Exhibit "1", the Defendants routinely billed Plaintiffs for medically unnecessary ESWT they purported to provide Insureds.

## 5.   The Fraudulent Charges for Pain Management Injections at ATM Healthcare

209.   As set forth in Exhibit "1", based upon the false, boilerplate "diagnoses" that the Defendants provided during their fraudulent initial and follow-up examinations, the Defendants purported to subject many Insureds to a series of medically unnecessary pain management injections.

210.   Ibrahim purported to perform virtually all of the pain management injections at ATM Healthcare, which then were billed through ATM Healthcare to GEICO, typically under CPT codes 20551, 20553, 20610, 62321, 62323, 64483, 64490, 64491, 64493, 64494, and 64495.

211.   Like the charges for the other Fraudulent Services, the charges for the pain management injections were fraudulent in that the pain management injections were medically unnecessary and were provided – to the extent that they were provided at all – pursuant to the false, boilerplate "diagnoses" that the Defendants provided during their fraudulent examinations.

212.   Moreover, in the claims for pain management injections identified in Exhibit "1", the charges for the pain management injections were fraudulent in that they misrepresented the Defendants' eligibility to collect PIP Benefits in the first instance. As set forth herein, Defendants never were eligible to collect PIP Benefits because of their fraudulent and unlawful activity, including but not limited to their violations of the Clinic Act, the False and Fraudulent Insurance Claims statute, and the Physical Therapy Act.

213.   Moreover, the substantial majority of the Insureds in the claims identified in Exhibit "1" were involved in relatively minor accidents.

214.   To the extent that the Insureds in the claims identified in Exhibit "1" experienced any injuries at all in their minor accidents, the injuries were minor soft tissue injuries such as sprains and strains.

215.   By the time the Defendants purported to provide pain management injections to the Insureds identified in Exhibit "1", the Insureds either had no presenting problems at all, or their presenting problems consisted of minor sprains and strains that were in the process of being resolved through conservative treatment.

216.   Even so, in the claims for pain management injections identified in Exhibit "1" McClerren and ATM Healthcare routinely purported to provide pain management injections to Insureds who did not have any serious pain symptoms secondary to any automobile accident that legitimately would warrant the injections.

217.   In their claims for pain management injections identified in Exhibit "1", McClerren and ATM Healthcare routinely misrepresented that the billed-for injections were medically necessary, when in fact they were not.

### III.   The Fraudulent Claims the Defendants Submitted or Caused to be Submitted to GEICO

218.   To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of HCFA-1500 forms and treatment reports through ATM Healthcare to GEICO seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

219.   The claims that the Defendants submitted or caused to be submitted to GEICO were false and misleading in the following, material respects:

(i)   The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Defendants were in compliance with the Clinic Act, the False and Fraudulent Insurance Claims Statute, and the Physical Therapy Act, and therefore were eligible to collect PIP Benefits in the first instance. In fact, the Defendants never were in compliance with the Clinic Act, the False and Fraudulent Insurance Claims Statute, and the Physical Therapy Act, and never was eligible to collect PIP Benefits, because of the fraudulent and unlawful scheme described above.

(ii)   The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were lawfully provided, lawfully billed to GEICO, and eligible for PIP reimbursement. In fact, the Fraudulent

Services were not lawfully provided or billed to GEICO, and were not eligible for PIP reimbursement, because: (a) they were medically unnecessary and provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (b) they were provided – to the extent that they were provided at all – in pervasive violation of the Clinic Act, the False and Fraudulent Insurance Claims Statute, and the Physical Therapy Act; and (c) in many cases, they were unlawfully performed – to the extent that they were performed at all – by massage therapists and other unlicensed individuals.

(iii)   The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed. In fact, the Fraudulent Services frequently were not performed at all and, to the extent that they were performed, they were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to it.

(iv)   The HCFA-1500 forms and treatment reports submitted or caused to be submitted by and on behalf of the Defendants uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided.

## IV.   The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

220.   The Defendants were legally and ethically obligated to act honestly and with integrity in connection with their performance of the Fraudulent Services and their submission of charges to GEICO.

221.   To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants have systemically concealed their fraud and have gone to great lengths to accomplish this concealment.

222.    The Defendants knowingly misrepresented and concealed facts related to ATM Healthcare and the Fraudulent Services in an effort to prevent discovery that ATM Healthcare was operated in violation of the Clinic Act, the False and Fraudulent Insurance Claims Statute, and the Physical Therapy Act.

223.    Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to a fraudulent pre-determined protocol designed to maximize the charges that could be submitted, not to benefit the Insureds who supposedly were subjected to them.

224.    Moreover, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services frequently were unlawfully performed by massage therapists and unlicensed individuals.

225.    Moreover, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services frequently never were performed in the first instance.

226.    For instance, the Defendants submitted facially valid HCFA-1500 forms, which purported to be signed and verified by properly licensed health care providers, in support of their fraudulent charges, and GEICO had a right to rely on this facially-valid billing.

90

227.   The Defendants have hired law firms to pursue collection of the fraudulent charges for the Fraudulent Services from GEICO and other insurers. These law firms routinely file expensive and time-consuming litigation against GEICO and other insurers if the charges are not promptly paid in full.

228.   GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and acts of concealment described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $7,900,000.00.

229.   Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### FIRST CAUSE OF ACTION
#### Against ATM Healthcare
#### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

230.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 229 above.

231.   There is an actual case in controversy between GEICO and ATM Healthcare regarding more than $75,000.00 in pending fraudulent claims for the Fraudulent Services that have been submitted to GEICO.

232.    ATM Healthcare has no right to receive payment for any pending bills submitted to GEICO because it unlawfully was operated in violation of the Clinic Act, the False and Fraudulent Insurance Claims Statute, and the Physical Therapy Act.

233.    ATM Healthcare has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not lawfully provided and billed to GEICO.

234.    ATM Healthcare has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

235.    ATM Healthcare has no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services never were provided in the first instance.

236.    ATM Healthcare has no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

237.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that ATM Healthcare has no right to receive payment for any pending bills submitted to GEICO.

## SECOND CAUSE OF ACTION
### Against McClerren
### (Violation of RICO, 18 U.S.C. § 1962(c))

238.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 229 above.

239.   ATM Healthcare is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

240.   McClerren knowingly has conducted and/or participated, directly or indirectly, in the conduct of the ATM Healthcare's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over six years seeking payments that ATM Healthcare was not eligible to receive under the No-Fault Law because: (i) ATM Healthcare unlawfully was operated in violation of the Clinic Act, the False and Fraudulent Insurance Claims Statute, and the Physical Therapy Act; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and

exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

241.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the charts annexed hereto as Exhibit "1".

242.   ATM Healthcare's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which McClerren operated ATM Healthcare, inasmuch as ATM Healthcare was not engaged in legitimate health care practice, and acts of mail fraud therefore were essential in order for ATM Healthcare to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through ATM Healthcare to the present day.

243.   ATM Healthcare is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by ATM Healthcare in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

244.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $7,900,000.00 pursuant to the fraudulent bills submitted through ATM Healthcare.

245.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against McClerren**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

246.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 229 above.

247.    ATM Healthcare is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

248.    McClerren – together with the ATM Nurses, ATM Physicians, and ATM Chiropractors, among others – knowingly agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of ATM Healthcare's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over six years seeking payments that ATM Healthcare was not entitled to receive under the No-Fault Laws because: (i) ATM Healthcare unlawfully was operated in violation of the Clinic Act, the False and Fraudulent Insurance Claims Statute, and the Physical Therapy Act; (ii) the underlying Fraudulent Services were not

lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

249.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the charts annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the fraudulent and unlawful scheme.

250.   ATM Healthcare's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which McClerren has operated ATM Healthcare, inasmuch as ATM Healthcare is not engaged in a legitimate chiropractic practice, and acts of mail fraud therefore are essential in order for ATM Healthcare to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to submit fraudulent billing to GEICO, and continue

96

to attempt collection on the fraudulent billing submitted through ATM Healthcare to the present day.

251.    ATM Healthcare is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by ATM Healthcare in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

252.    McClerren knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

253.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $7,900,000.00 pursuant to the fraudulent bills submitted through ATM Healthcare.

254.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### FOURTH CAUSE OF ACTION
**Against McClerren and ATM Healthcare**
**(Common Law Fraud)**

255.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 229 above.

256.    McClerren and ATM Healthcare intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts

from GEICO in the course of their submission of thousands of fraudulent bills through ATM Healthcare for the Fraudulent Services.

257.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that ATM Healthcare was in compliance with the Clinic Act, the False and Fraudulent Insurance Claims Statute, and the Physical Therapy Act, and eligible to collect PIP Benefits in the first instance, when in fact ATM Healthcare never was in compliance with the Clinic Act, the False and Fraudulent Insurance Claims Statute, and the Physical Therapy Act; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided, lawfully billed to GEICO, and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, were not lawfully billed to GEICO, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; (iv) in many claims, the representations that the services had been performed or directly supervised by persons other than massage therapists or unlicensed individuals, and concealment of the fact that the services had been unlawfully performed by massage therapists or unlicensed individuals; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

258.   The Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce

GEICO to pay charges submitted through ATM Healthcare that were not reimbursable.

259.   GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $7,900,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted through ATM Healthcare.

260.   The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

261.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FIFTH CAUSE OF ACTION
### Against McClerren and ATM Healthcare
### (Under Fla. Stat. § 501.201 et. seq.)

262.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1 through 229 above.

263.   McClerren and ATM Healthcare are actively engaged in trade and commerce in the State of Florida.

264.   GEICO and its Insureds are "consumers" as defined by Fla. Stat. § 501.203.

265.   McClerren and ATM Healthcare engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally-obtain PIP Benefits from GEICO.

266.   The claims and supporting documents submitted to GEICO in connection with the Fraudulent Services were unfair, deceptive, and unconscionable in that they misrepresented: (i) ATM Healthcare's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

267.   Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous.  Additionally, the conduct of the Defendants has been materially injurious to GEICO and its Insureds.

268.   The conduct of the Defendants was the actual and proximate cause of the damages sustained by GEICO.

269.   The Defendants' unfair and deceptive acts have caused GEICO to sustain damages of at least $7,900,000.00.

270.   By reason of Defendants' conduct, GEICO is also entitled to recover costs, and reasonable attorneys' fees.

### SIXTH CAUSE OF ACTION
#### Against McClerren and ATM Healthcare
#### (Unjust Enrichment)

271.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1 through 229 above.

272.   As set forth above, McClerren and ATM Healthcare have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

273.   When GEICO paid the bills and charges submitted or caused to be submitted by McClerren through ATM Healthcare, it reasonably believed that it was legally obligated to make such payments based on the McClerren and ATM Healthcare's improper, unlawful, and/or unjust acts.

274.   McClerren and ATM Healthcare have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that McClerren and ATM Healthcare voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

275.   McClerren and ATM Healthcare's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

276.   By reason of the above, McClerren and ATM Healthcare have been unjustly enriched in an amount to be determined at trial, but in no event less than $7,900,000.00.

## **JURY DEMAND**

277.   Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. demand that a Judgment be entered in their favor:

A.     On the First Cause of Action against ATM Healthcare, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that ATM Healthcare has no right to receive payment for any pending bills submitted to GEICO;

B.     On the Second Cause of Action against McClerren, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $7,900,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.     On the Third Cause of Action against McClerren, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $7,900,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.     On the Fourth Cause of Action against McClerren and ATM Healthcare, compensatory damages in an amount to be determined at trial but in excess of $7,900,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E.     On the Fifth Cause of Action against McClerren and ATM Healthcare, compensatory damages in an amount to be determined at trial but in excess of $7,900,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2); and

F.     On the Sixth Cause of Action against McClerren and ATM Healthcare, compensatory damages in an amount to be determined at trial but in excess of

$7,900,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper.

Dated:                    November 2, 2023

/s/ *John Marino*
Max Gershenoff (FBN 1038855)
John P. Marino (FBN 814539)
Steven T. Henesy (FBN 1038474)
Kristen L. Wenger (FBN 1035899)
RIVKIN RADLER LLP
1301 Riverplace Boulevard – 10th Floor
Jacksonville, Florida 32207
Phone: (904) 792-8925
Facsimile: (904) 467-3461
max.gershenoff@rivkin.com
john.marino@rivkin.com
steven.henesy@rivkin.com
kristen.wenger@rivkin.com

*Counsel for Plaintiffs*